**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

VOTERLABS, INC.,     )
            )
            )
    Plaintiff,    )
            )
   v.       )  C.A. No. 19-524-RGA
            )
ETHOS GROUP CONSULTING  )
SERVICES, LLC,     )
            )
            )
    Defendant.   )

**DEFENDANT'S ORIGINAL ANSWER TO
FIRST AMENDED COMPLAINT AND FIRST AMENDED COUNTERCLAIM**

Defendant Ethos Group Consulting Services, LLC ("Defendant" or "Ethos Consulting"), by and through its attorneys, answers the First Amended Complaint ("Amended Complaint") (Doc. 52) filed by Plaintiff VoterLabs, Inc. ("Plaintiff" or "VoterLabs") and files its First Amended Counterclaim, as follows:[1]

**SPECIFIC RESPONSES TO PLAINTIFF'S AMENDED COMPLAINT**

Ethos Consulting answers each of the numbered paragraphs in the Amended Complaint with the corresponding subpart titles and paragraph numbers below.

---

[1] On April 27, 2020, VoterLabs filed its First Amended Complaint (D.I. 52). On April 28, 2020, Ethos Consulting filed its First Amended Answer and Counterclaim (D.I. 55) in response to the VoterLabs's Original Complaint (D.I. 2). The only amendment was the seventh (7th) affirmative defense (unenforceable penalty). On May 7, 2020, Ethos Consulting filed its Partial Motion to Dismiss as to VoterLabs's new claim raised on April 27, 2020 (D.I. 59). On May 11, 2020, without waiving the Partial Motion to Dismiss, Ethos Consulting filed its Original Answer and Counterclaim in response to VoterLabs's First Amended Complaint (D.I. 61, at pp. 14-15). Ethos Consulting did not raise any different affirmative defenses or amend the Counterclaim. *Compare* D.I. 55 *with* D.I. 61.

**Nature of the Action**

1.      Ethos Consulting admits that Plaintiff asserts claims for breach of contract and an alleged tortious scheme and seeks damages. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 1 of the Amended Complaint.

**Jurisdiction and Venue**

2.      Ethos Consulting admits the allegations in Paragraph 2 of the Amended Complaint.

3.      Ethos Consulting admits the allegations in Paragraph 3 of the Amended Complaint.

4.      Ethos Consulting admits that this Court has jurisdiction over this action. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 4 of the Amended Complaint.

5.      Ethos Consulting admits that it is a Delaware limited liability company, that this Court has jurisdiction over the parties to this action, and that venue lies in this District. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 5 of the Amended Complaint.

**The Parties**

A.      **VoterLabs**

6.      Ethos Consulting admits that VoterLabs advertises it offers data analytics, microtargeting, and custom software and that Walter Kawecki is affiliated with VoterLabs. Ethos Consulting lacks knowledge or information sufficient to form a belief regarding VoterLabs's clients and therefore denies the same. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 6 of the Amended Complaint.

**B.      Ethos Consulting**

7.      Ethos Consulting admits it is a private company and that Dave Terek is a principal. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 7 of the Amended Complaint.

8.      Ethos Consulting denies the allegations in Paragraph 8 of the Amended Complaint.

## Facts

**C.      The 2016 NDA and Interim Agreement**

9.      Ethos Consulting admits the parties executed a Confidentiality and Non-Disclosure Agreement ("NDA") dated May 5, 2016. The NDA speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 9 inconsistent with the terms of the NDA.

10.      Ethos Consulting admits a Service Agreement and Statement of Work ("Interim Agreement") dated December 20, 2016, was executed on or about January 18, 2017. The Interim Agreement speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 10 inconsistent with the terms of the Interim Agreement.

11.      Ethos Consulting admits VoterLabs received $55,000. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 11 of the Amended Complaint.

12.      The Interim Agreement speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 12 inconsistent with the terms of the Interim Agreement.

13.      Ethos Consulting admits VoterLabs emailed Ethos Consulting a document entitled "Master_Roadmap_March_2017_ETHGRP.pdf" on or about March 28, 2017. The document referenced in Paragraph 13 speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 13 inconsistent with the terms of the document referenced therein.

14.      Ethos Consulting admits the allegations in Paragraph 14 of the Amended Complaint.

3

15.     Ethos Consulting admits the allegations in Paragraph 15 of the Amended Complaint.

16.     Ethos Consulting denies the allegations in Paragraph 16 of the Amended Complaint.

**D.     The April 6, 2017 Oral Agreement**

17.     Ethos Consulting denies the allegations in Paragraph 17 of the Amended Complaint.

18.     Ethos Consulting denies the allegations in Paragraph 18 of the Amended Complaint.

19.     Ethos Consulting denies the allegations in Paragraph 19 of the Amended Complaint.

20.     Ethos Consulting denies the allegations in Paragraph 20 of the Amended Complaint.

21.     Ethos Consulting lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 21 of the Amended Complaint and therefore denies the same.

**E.     The Project Overview**

22.     Ethos Consulting admits the allegations in Paragraph 22 of the Amended Complaint.

23.     Ethos Consulting admits the allegations in Paragraph 23 of the Amended Complaint.

24.     The document referenced in Paragraph 24 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 24 inconsistent with the terms of the document referenced therein.

25.     The document referenced in Paragraph 25 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 25 inconsistent with the terms of the document referenced therein.

26.     Ethos Consulting denies the allegations in Paragraph 26 of the Amended Complaint.

27.     The document referenced in Paragraph 27 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 27 inconsistent with the terms of the document referenced therein.

28.     The document referenced in Paragraph 28 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 28 inconsistent with the terms of the document referenced therein.

29.     Ethos Consulting admits VoterLabs received $109,700 on or about June 12, 2017. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 29 of the Amended Complaint.

30.     Ethos Consulting admits VoterLabs received $142,900 on or about September 14, 2017. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 30 of the Amended Complaint.

**F.      The 2017 Written Agreement**

31.     Ethos Consulting admits it engaged in negotiations with VoterLabs regarding a potential agreement. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 31 of the Amended Complaint.

32.     Ethos Consulting admits the allegations in Paragraph 32 of the Amended Complaint.

33.     Ethos Consulting admits it engaged in negotiations with VoterLabs regarding a potential agreement. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 33 of the Amended Complaint.

34.     Ethos Consulting admits it engaged in negotiations with VoterLabs regarding a potential agreement. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 34 of the Amended Complaint.

35.     Ethos Consulting admits that Terek and Surprise had discussions with Kawecki and/or Wiles. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 35 of the Amended Complaint.

36.     Ethos Consulting admits Surprise maintained drafts of the document referenced therein. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 36 of the Amended Complaint.

37.     Ethos Consulting admits the allegations in Paragraph 37 of the Amended Complaint.

38.     Ethos Consulting admits the allegations in Paragraph 38 of the Amended Complaint.

39.     The documents referenced in Paragraph 39 of the Amended Complaint speak for themselves, and Ethos Consulting denies any and all allegations in Paragraph 39 inconsistent with the terms of the documents referenced therein.

### 1.      Engagement Payments

40.     The document referenced in Paragraph 40 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 40 inconsistent with the terms of the document referenced therein.

41.     Ethos Consulting lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 41 of the Amended Complaint and therefore denies the same.

42.     The document referenced in Paragraph 42 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 42 inconsistent with the terms of the document referenced therein.

43.     The document referenced in Paragraph 43 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 43 inconsistent with the terms of the document referenced therein.

44.     Ethos Consulting denies the allegations in Paragraph 44 of the Amended Complaint.

45.     Ethos Consulting admits the allegations in Paragraph 45 of the Amended Complaint.

46.     The document referenced in Paragraph 46 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 46 inconsistent with the terms of the document referenced therein.

47.     Ethos Consulting admits the allegations in Paragraph 47 of the Amended Complaint.

48.     Ethos Consulting admits VoterLabs received $195,450 on or about December 22, 2017. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 48 of the Amended Complaint.

###### 2.      Termination Payment

49.      The document referenced in Paragraph 49 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 49 inconsistent with the terms of the document referenced therein.

50.      Ethos Consulting denies the allegations in Paragraph 50 of the Amended Complaint.

51.      The document referenced in Paragraph 51 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 51 inconsistent with the terms of the document referenced therein.

52.      The document referenced in Paragraph 52 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 52 inconsistent with the terms of the document referenced therein.

53.      Ethos Consulting denies the allegations in Paragraph 53 of the Amended Complaint.

54.      Ethos Consulting denies the allegations in Paragraph 54 of the Amended Complaint.

55.      Ethos Consulting admits that negotiations occurred between Ethos Consulting and VoterLabs and that the parties traded drafts of proposed language. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 55 of the Amended Complaint.

56.      The document referenced in Paragraph 56 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 56 inconsistent with the terms of the document referenced therein.

57.      Ethos Consulting denies the allegations in Paragraph 57 of the Amended Complaint.

58.     Ethos Consulting denies the allegations in Paragraph 58 of the Amended Complaint.

### 3.      Forthright Negotiator Principle

59.     Ethos Consulting denies the allegations in Paragraph 59 of the Amended Complaint.

60.     The document referenced in Paragraph 60 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 60 inconsistent with the terms of the document referenced therein.

61.     The document referenced in Paragraph 61 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 61 inconsistent with the terms of the document referenced therein.

62.     The document referenced in Paragraph 62 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 62 inconsistent with the terms of the document referenced therein.

63.     Ethos Consulting denies the allegations in Paragraph 63 of the Amended Complaint.

64.     Ethos Consulting admits the allegations in Paragraph 64 of the Amended Complaint.

65.     Ethos Consulting denies the allegations in Paragraph 65 of the Amended Complaint.

66.     The document referenced in Paragraph 66 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 66 inconsistent with the terms of the document referenced therein.

67.     The document referenced in Paragraph 67 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 67 inconsistent with the terms of the document referenced therein.

68.     Ethos Consulting admits drafts were exchanged among the parties between November 30, 2017, and December 18, 2017. The documents referenced in Paragraph 68 of the Amended Complaint speak for themselves, and Ethos Consulting denies any and all allegations in Paragraph 68 inconsistent with the terms of the documents referenced therein.

69.     The documents referenced in Paragraph 69 of the Amended Complaint speak for themselves, and Ethos Consulting denies any and all allegations in Paragraph 69 inconsistent with the terms of the documents referenced therein.

**G.     Termination Without Cause**

70.     Ethos Consulting admits that Jeff Thomas was involved in the project on Ethos Consulting's side. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 70 of the Amended Complaint.

71.     Ethos Consulting denies the allegations in Paragraph 71 of the Amended Complaint.

72.     Ethos Consulting admits Scarlett Shipp worked as President of the Synergy Division of CRIF Lending Solutions. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 72 of the Amended Complaint.

73.     Ethos Consulting admits Don Judice worked in the automotive sector. Except insofar as admitted herein, Ethos Consulting lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 73 of the Amended Complaint and therefore denies the same.

74.     Ethos Consulting lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 74 of the Amended Complaint and therefore denies the same.

75.     Ethos Consulting admits it did not make the payment referenced in Paragraph 75 of the Amended Complaint. Ethos Consulting denies the payment became payable on or about March 9, 2018. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 75 of the Amended Complaint.

76.     Ethos Consulting admits Kawecki made inquiries as to payment. Except insofar as admitted herein, Ethos Consulting lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 76 of the Amended Complaint and therefore denies the same.

77.     Ethos Consulting admits Shipp sent an email to Kawecki on or about April 4, 2018. Except insofar as admitted herein, Ethos Consulting lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 77 of the Amended Complaint and therefore denies the same.

78.     Ethos Consulting admits the allegations in Paragraph 78 of the Amended Complaint.

79.     Ethos Consulting admits the allegations in Paragraph 79 of the Amended Complaint.

80.     Ethos Consulting admits that Kawecki expressed opposition to pausing development. Except insofar as admitted herein, Ethos Consulting lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 80 of the Amended Complaint and therefore denies the same.

81.     Ethos Consulting admits that Shipp expressed her willingness to assist in reaching a resolution for the project. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 81 of the Amended Complaint.

82.     Ethos Consulting lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 82 of the Amended Complaint and therefore denies the same.

83.     Ethos Consulting admits a meeting took place in Texas on or about April 10 and 11, 2018. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 83 of the Amended Complaint.

84.     Ethos Consulting denies the allegations in Paragraph 84 of the Amended Complaint.

85.     Ethos Consulting admits that discussions concerning moving forward occurred. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 85 of the Amended Complaint.

86.     Ethos Consulting admits the allegations in Paragraph 86 of the Amended Complaint.

87.     Ethos Consulting admits that the parties discussed future deployment dates. Except insofar as admitted herein, Ethos Consulting lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 87 of the Amended Complaint and therefore denies the same.

88.     Ethos Consulting admits that Shipp expressed a desire that Ethos Consulting own the software and associated IP and that Kawecki expressed a willingness to agree. Except insofar

as admitted herein, Ethos Consulting denies the allegations in Paragraph 88 of the Amended Complaint.

89.     Ethos Consulting admits VoterLabs received $228,700 on or about April 26, 2018. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 89 of the Amended Complaint.

90.     Ethos Consulting denies the allegations in Paragraph 90 of the Amended Complaint.

91.     The document referenced in Paragraph 91 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 91 inconsistent with the terms of the document referenced therein.

92.     The document referenced in Paragraph 92 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 92 inconsistent with the terms of the document referenced therein.

93.     Ethos Consulting admits that Shipp's request to pause development and Kawecki's opposition to same were discussed prior to the April 24, 2018 meeting. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 93 of the Amended Complaint.

94.     Ethos Consulting admits Kawecki called Terek on or about May 3, 2018. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 94 of the Amended Complaint.

95.     Ethos Consulting admits Terek called Kawecki on or about May 18, 2018, and informed him that Ethos Consulting would likely terminate the Agreements. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 95 of the Amended Complaint.

96.     The document referenced in Paragraph 96 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 96 inconsistent with the terms of the document referenced therein.

97.     Ethos Consulting admits the allegations in Paragraph 97 of the Amended Complaint.

98.     Ethos Consulting admits the allegations in Paragraph 98 of the Amended Complaint.

99.     The document referenced in Paragraph 99 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 99 inconsistent with the terms of the document referenced therein.

100.    Ethos Consulting denies the allegations in Paragraph 100 of the Amended Complaint.

101.    The document referenced in Paragraph 101 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 101 inconsistent with the terms of the document referenced therein.

102.    Ethos Consulting admits the allegations in Paragraph 102 of the Amended Complaint.

103.    Ethos Consulting admits the allegations in Paragraph 103 of the Amended Complaint.

104.    Ethos Consulting admits that Kawecki requested additional payments. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 104 of the Amended Complaint.

105.    Ethos Consulting admits VoterLabs was offered $200,000 to resolve any dispute, but Ethos Consulting denies it was obligated to pay the $200,000 or any termination payment. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 105 of the Amended Complaint.

106.    Ethos Consulting denies the allegations in Paragraph 106 of the Amended Complaint.

### H.    Ethos Group's Malicious Conduct[2]

107.    Ethos Consulting admits conversations between Kawecki and Shipp took place on or about May 18, 2018. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 107 of the Amended Complaint.

108.    Ethos Consulting admits that Shipp requested VoterLabs to deliver the software in a deployable state without VoterLabs's data inputs, which were insufficient to run the software effectively. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 108 of the Amended Complaint.

109.    Ethos Consulting admits that Kawecki requested Ethos Consulting to pay additional money to VoterLabs. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 109 of the Amended Complaint.

110.    The document referenced in Paragraph 110 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 110 inconsistent with the terms of the documents referenced therein.

---

[2] VoterLabs filed its Amended Complaint on April 27, 2020 (D.I. 52). On May 7, 2020, Ethos Consulting filed a Partial Motion to Dismiss VoterLabs's Amended Complaint and Brief in Support, directed to Count III of the Amended Complaint (D.I. 59–60). Under Federal Rule of Civil Procedure 12(a)(4), Ethos Consulting's deadline to answer Count 3 of Plaintiff's Amended Complaint is extended until further determination by the Court. Ethos Consulting responds to Paragraphs 107-153 and 160-161, which are directed towards Count III, without waiting its rights under, and relief sought pursuant to the pending Motion to Dismiss.

111.    Ethos Consulting denies the allegations in Paragraph 111 of the Amended Complaint.

112.    Ethos Consulting admits the allegations in Paragraph 112 of the Amended Complaint.

113.    Ethos Consulting admits that in response to Kawecki's June 15, 2018 email, Scarlett Shipp responded, "Nothing new to report. Legal is working on the contract. They said they are looking into some items to clarify." Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 113 of the Amended Complaint.

114.    Ethos Consulting admits an email was sent on or about June 25, 2018, and such document speaks for itself.   Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 114 of the Amended Complaint.

115.    The document referenced in Paragraph 115 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 115 inconsistent with the terms of the document referenced therein.

116.    Ethos Consulting denies the allegations in Paragraph 116 of the Amended Complaint.

117.    Ethos Consulting admits that the individuals referenced in Paragraph 117 of the Amended Complaint participated in a call on or about June 26, 2018, and that Shipp informed Kawecki that the termination provision did not apply because, among other reasons, VoterLabs failed to complete the project. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 117 of the Amended Complaint.

118.    Ethos Consulting admits the allegations in Paragraph 118 of the Amended Complaint.

119.    Ethos Consulting denies the allegations in Paragraph 119 of the Amended Complaint.

120.    Ethos Consulting admits that Walter Kawecki sent an email to William Surprise and Scarlett Shipp on or about July 12, 2018, which speaks for itself. Except insofar as admitted, Ethos Consulting denies the allegations in Paragraph 120 of the Amended Complaint.

121.    Ethos Consulting denies the allegations in Paragraph 121 of the Amended Complaint.

122.    Ethos Consulting denies the allegations in Paragraph 122 of the Amended Complaint.

123.    Ethos Consulting denies the allegations in Paragraph 123 of the Amended Complaint.

124.    Ethos Consulting denies the allegations in Paragraph 124 of the Amended Complaint.

125.    Ethos Consulting admits the allegations in Paragraph 125 of the Amended Complaint.

126.    The document referenced in Paragraph 126 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 126 inconsistent with the terms of the document referenced therein.

127.    The document referenced in Paragraph 127 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 127 inconsistent with the terms of the document referenced therein.

128.    The document referenced in Paragraph 128 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 128 inconsistent with the terms of the document referenced therein.

129.    The document referenced in Paragraph 129 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 129 inconsistent with the terms of the document referenced therein.

130.    Ethos Consulting denies the allegations in Paragraph 130 of the Amended Complaint.

131.    Ethos Consulting admits that the individuals referenced in Paragraph 131 of the Amended Complaint participated in a call on or about July 13, 2018, and that Shipp and Judice informed Kawecki that Ethos Consulting would not make an additional payment over and above anything that was owed under the Agreements. Except insofar as admitted herein, Ethos Consulting denies the allegations in Paragraph 131 of the Amended Complaint.

132.    Ethos Consulting denies the allegations in Paragraph 132 of the Amended Complaint.

133.    The document referenced in Paragraph 133 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 133 inconsistent with the terms of the document referenced therein.

134.    The document referenced in Paragraph 134 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 134 inconsistent with the terms of the document referenced therein.

135.    Ethos Consulting denies the allegations in Paragraph 135 of the Amended Complaint.

136.    Ethos Consulting denies the allegations in Paragraph 136 of the Amended Complaint.

137.    Ethos Consulting denies the allegations in Paragraph 137 of the Amended Complaint.

138.    Ethos Consulting denies the allegations in Paragraph 138 of the Amended Complaint.

139.    Ethos Consulting denies the allegations in Paragraph 139 of the Amended Complaint.

140.    Ethos Consulting admits the allegations in Paragraph 140 of the Amended Complaint.

141.    Ethos Consulting admits the allegations in Paragraph 141 of the Amended Complaint.

142.    Ethos Consulting admits that a call took place including the referenced individuals on or about August 22, 2018. Except insofar as admitted, Ethos Consulting denies the allegations in Paragraph 142 of the Amended Complaint.

143.    Ethos Consulting denies the allegations in Paragraph 143 of the Amended Complaint.

144.    Ethos Consulting admits the allegations in Paragraph 144 of the Amended Complaint.

145.    Ethos Consulting admits that William Surprise's primary recollection of the majority of the July 13, 2018 call is that the call consisted of Walter Kawecki acting unprofessionally, using vulgar language to describe Scarlett Shipp and David Terek, refusing to accept responsibility for VoterLabs's failure to complete the project, misconstruing the settlement

reached with Ethos Consulting on May 30, 2018, and arguing with Don Judice. Except insofar as admitted, Ethos Consulting denies the allegations in Paragraph 145 of the Amended Complaint.

146.    Ethos Consulting denies the allegations in Paragraph 146 of the Amended Complaint.

147.    The document referenced in Paragraph 147 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 147 inconsistent with the terms of the document referenced therein.

148.    Ethos Consulting denies the allegations in Paragraph 148 of the Amended Complaint.

149.    Ethos Consulting denies the allegations in Paragraph 149 of the Amended Complaint.

150.    Ethos Consulting denies the allegations in Paragraph 150 of the Amended Complaint.

151.    The document referenced in Paragraph 151 of the Amended Complaint speaks for itself, and Ethos Consulting denies any and all allegations in Paragraph 151 inconsistent with the terms of the document referenced therein.

152.    Ethos Consulting admits the allegations in Paragraph 152 of the Amended Complaint.

153.    Ethos Consulting admits the allegations in Paragraph 153 of the Amended Complaint.

**COUNT 1:    Breach of Contract – Payment Number Five (Service Agreement § 8.2 and Statement of Work § 4(a))**

154.    Ethos Consulting incorporates by reference its responses to Paragraphs 1–153 of the Amended Complaint as though fully set forth herein.

155.    Paragraph 155 of the Amended Complaint contains legal conclusions or arguments to which no response is required. To the extent a response is required, Ethos Consulting denies the allegations contained in Paragraph 155 of the Amended Complaint.

156.    Paragraph 156 of the Amended Complaint contains legal conclusions or arguments to which no response is required. To the extent a response is required, Ethos Consulting denies the allegations contained in Paragraph 156 of the Amended Complaint.

157.    Paragraph 157 of the Amended Complaint contains legal conclusions or arguments to which no response is required. To the extent a response is required, Ethos Consulting denies the allegations contained in Paragraph 157 of the Amended Complaint.

**COUNT 2:**    **Breach of Contract – Termination Payment (Service Agreement § 8.2 and Statement of Work § 4(d))**

158.    Ethos Consulting incorporates by reference its responses to Paragraphs 1–157 of the Amended Complaint as though fully set forth herein.

159.    Paragraph 159 of the Amended Complaint contains legal conclusions or arguments to which no response is required. To the extent a response is required, Ethos Consulting denies the allegations contained in Paragraph 159 of the Amended Complaint.

**COUNT 3:**    **Malicious Breach of Contract**

160.    Ethos Consulting incorporates by reference its responses to Paragraphs 1–159 of the Amended Complaint as though fully set forth herein.

161.    Paragraph 161 of the Amended Complaint contains legal conclusions or arguments to which no response is required. To the extent a response is required, Ethos Consulting denies the allegations contained in Paragraph 161 of the Amended Complaint.

## RESPONSE TO REQUEST FOR RELIEF

Ethos Consulting denies that Plaintiff is entitled to any of the relief requested in the Request for Relief of the Amended Complaint.

## RESPONSE TO JURY DEMAND

The unnumbered paragraph in the Amended Complaint requesting a jury requires no response.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part by Plaintiff's prior material breach of the Services Agreement and SOW by failing to complete any of the three Feature Groups or provide Ethos Consulting with anything of value.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part by failure of consideration in that Plaintiff accepted money for work that it did not perform and failed to produce any useable software or provide Ethos Consulting with anything of value.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part by setoff or recoupment of the monies that Defendant is entitled to because of Plaintiff's breach of contract and failure to utilize Defendant's funds to complete the Feature Groups.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part by the failure of the condition precedent under Sections 4(a) and/or 6 of the SOW of completion of the three Feature Groups.

### FIFTH AFFIRMATIVE DEFENSE

Pleading in the alternative, to the extent the Court determines one or more clauses in Section 4(a) are ambiguous, no enforceable meetings of the mind occurred that is capable of enforcement.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part by Sections 8.2, 10.1, 10.3, 11.2, 11.3, 13 of the Services Agreement, and Sections 4 and 6 of the SOW.

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims for breach of Section 4(a) of the SOW are barred as a legally unenforceable penalty.

### COUNTERCLAIM

In further response to the Amended Complaint, Defendant Ethos Consulting alleges the following First Amended Counterclaim, without prejudice to any denial in its Answer, and without admission to any allegation in Plaintiff's Amended Complaint, unless otherwise explicitly admitted above, and without assuming any burden when such burden would otherwise be Plaintiff's burden, as Counter-Defendant, and respectfully shows as follows:

A.     **Parties**

1.     Ethos Consulting is a Delaware limited liability company with its principal place of business in Irving, Texas.

2.      VoterLabs is a Connecticut corporation with its principal place of business in Branford, Connecticut.[3]

**B.      Jurisdiction and Venue**

3.      This Court has subject-matter jurisdiction over this matter under 28 U.S.C. § 1332. VoterLabs is a citizen of Connecticut, and Ethos Consulting is a citizen of Delaware for purposes of 28 U.S.C. § 1332, and the amount in controversy exceeds $75,000 exclusive of interest and costs.[4]

4.      The parties have consented to personal jurisdiction in this Court and to venue in this District.

**C.      Factual Background**

5.      The fraud perpetrated by Walter Kawecki ("Kawecki"), CEO of VoterLabs (and others), upon Ethos Consulting was simple in execution, yet complex to uncover.   Prior to VoterLabs introduction to "Ethos Group,"[5] Kawecki was VoterLabs's only employee, and it had no other significant revenue sources.   Kawecki quickly recognized that if he could sell Ethos Consulting on a software development project (over $1,500,000 in represented costs to complete)[6] (the "Ethos Software Project"),[7] VoterLabs could siphon money into other VoterLabs's projects.[8]

---

[3] Ethos Consulting requested that Kawecki agree to waive jurisdictional and venue issues for a lawsuit in federal district court in Delaware.  He never responded.

[4] Ethos Consulting's sole member is Ethos Group Services, Inc., a Delaware corporation with its principal place of business in the State of Texas.  Therefore, Ethos Consulting is a citizen of Delaware and Texas.

[5] The only "Ethos" entity that contracted with VoterLabs is Ethos Consulting.  "Ethos Group" refers to a group of separate but affiliated companies that work with automotive dealers throughout the United States.

[6] The two-year total for the Ethos Software Project, if completed, was to be approximately $1,500,000.

[7] On December 18, 2017, Ethos Consulting and VoterLabs fully executed (1) the Services Agreement and (2) the Statement of Work ("SOW") (collectively, the "Agreements").  The Agreements have an effective date of October 23, 2017.

[8] Fifteen months into this litigation, and VoterLabs still refuses to show where all of Ethos Consulting's money went.

6.      Between June 2017 and April 2018, VoterLabs executed on its fraud and obtained $676,750 from Ethos Consulting, the majority of which it appears VoterLabs spent on other projects.

7.      On May 21, 2018, Ethos Consulting terminated the Ethos Software Project.

8.      On November 1, 2018, VoterLabs finally turned over its "work product" to Ethos Consulting, while threatening to sue Ethos Consulting for damages.  This "work product" is called "NeosInsight."

9.      On January 6, 2019, someone reserved the website for "Axilient," https://who.is/whois/axilient.com.

10.     On October 6, 2019, VoterLabs proudly announced a project it had spent the prior several years in "stealth" mode developing: Axilient.



October 1, 2019 —

NEW HAVEN, Conn - VoterLabs, Inc. announces the launch of Axilient, and new flagship platform, Velocity, which combines modular data infrastructure with automated AI and continuous emergent discovery capabilities. The launch is part of the VoterLabs strategy to offer an artificial intelligence & machine learning solution to enterprise markets and small to medium sized commercial businesses.

The launch marks the culmination of several years of stealth development, testing, and refinement by a cross-functional team of data scientists, software engineers, strategy consultants, and business experts. Velocity provides a fully configurable data science solution that offers customers multiple integration points using a modularized design.

http://nextnewtech.com/news/voterlabs-announces-launch-of-new-private-sector-facing-brand-and-enterprise-class-flagship-platform/0187007

11.     In hindsight, it is now clear VoterLabs spent its time (and Ethos Consulting's money) developing Axilient instead of NeosInsight.[9]



### 1.     Ethos Consulting and VoterLabs begin their business relationship.

12.     VoterLabs advertises that it provides data analytics, microtargeting, and custom software for political organizations and enterprise clients, and it describes itself as an audience-targeting platform that uses multiple data points to uniquely identify matching individuals.

13.     On May 5, 2016, Ethos Consulting and VoterLabs entered into a Confidentiality and Non-Disclosure Agreement, and began discussions concerning how to analyze Ethos Group's data.

14.     On January 26, 2017 (with an effective date of December 20, 2016), Ethos Consulting and VoterLabs entered into a Services Agreement related to an analysis of Ethos Group's data.  The scope of this project consisted of de-duplication of data, an analysis of databases and systems, and data enrichment with an eye toward proposing some type of data analysis program in the future.

15.     Ethos Consulting paid VoterLabs $55,000 for these initial services.

16.     During the introductory phase, multiple individuals, who are upon information and belief equity holders in VoterLabs, interacted with Ethos Consulting and went out of their way to give the appearance they were employees of VoterLabs.  Damian Smith ("Smith"), Stephen Chaput

---

[9] In theory Axilient may actually work, unlike NeosInsight, which does not.

("Chaput"), and Andy Atherton ("Atherton") (collectively, the "VoterLabs Members")[10] used "@voterlabs.com" email accounts to interact with Ethos Consulting, in particular, Jeff Thomas ("Thomas").[11]

> **2.     In 2017, VoterLabs pitches a software project it was unable to handle with a fraudulent cost estimate to allow it to siphon money off for other projects.**

17.     Upon information and belief, in early 2017, Kawecki realized that if he could land a large enough software development project with Ethos Consulting, he could funnel money into other projects such as an "ai-data engine" (presumably the data engine that now runs Axilient).

18.     In April 2017, Kawecki and Damian Smith traveled to Dallas, Texas for the purpose of pitching a complex software program that Ethos Consulting could use in dealerships, for online marketing and advertising, and through mobile applications on cellphones targeting non-Ethos Group dealers.[12]

19.     Because VoterLabs had no developers, much less multiple developers needed for a project of the size and scope of the Ethos Software Project, Kawecki recruited a freelance developer (Greg Rubino ("Rubino")) to work behind the scenes in developing a pitch for Ethos Consulting.

20.     Kawecki used Rubino to develop a budget, which Kawecki then inflated. Kawecki's motivation was clear: to underpay Rubino, overcharge Ethos Consulting, and siphon money elsewhere.

---

[10]   In 2014, it does appear that Atherton, Smith, Chaput, and Kawecki worked at VoterLabs. https://insurancenewsnet.com/oarticle/VoterLabs-Launches-Political-Text-2-Donate-Platform-With-Real-Time-Data-a-530034#.XtgmCjpKiUk.

[11]   Within the Ethos Group structure, employees are employed by Ethos Group Resources, Inc. ("ERG"), and then either formally or informally assigned roles or task for Ethos entities as appropriate.  For ease for reference, such employees are referred to as working for Ethos Consulting, unless otherwise appropriate.

[12]   All told, Kawecki made five separate trips to Dallas, Texas during the course of the VoterLabs/Ethos Consulting relationship.

21.     Specifically, Rubino informed Kawecki he should budget $6,000 per month for a senior developer of Rubino's skill set.  As further elaborated, Kawecki tripled Rubino's budget to skim money somewhere, presumably to himself and other VoterLabs projects.

22.     Internally, Kawecki and the VoterLabs Members knew VoterLabs did not have the resources needed to successfully complete the Ethos Software Project.  Undeterred, Kawecki, with the help of one or more of the VoterLabs Members, prepared a document outlining the proposal to Ethos Consulting with a pdf titled "VoterLabs Ethos Group Project Overview" (the "Project Overview").

23.     On April 24, 2017, Kawecki forwarded the Project Overview to Thomas along with the following false representations:

    a.   "VoterLabs revenue model for this venture is based on recurring revenue from licensing, rather than maximizing profit for custom development. Therefore, VoterLabs will act in good faith to avoid unnecessary expenses or markups." ("Revenue Misrepresentations");

    b.   The following table specifies VoterLabs's out-of-pocket costs (the "Cost Misrepresentations"): [13]

---

[13] VoterLabs and Ethos Consulting would later define these quarterly payments as "Engagement Payments," consisting of eight payments covering twenty-four months. *See* SOW § 4(d) (identifying Engagement Payments Nos. 1-8).

28

| Months 1-3 | | |
| --- | --- | --- |
| VoterLabs | $ 19,066.67 | $ 57,200.00 |
| Sr. Developer 1 | $ 17,500.00 | $ 52,500.00 |
| Sr. Developer 2 | $ - | $ - |
| Developer 1 | $ - | $ - |
| Developer 2 | $ - | $ - |
| | Total | $ 109,700.00 |

| Months 4-6 | | |
| --- | --- | --- |
| VoterLabs | $ 19,066.67 | $ 57,200.00 |
| Sr. Developer 1 | $ 17,500.00 | $ 52,500.00 |
| Sr. Developer 2 | $ - | $ - |
| Developer 1 | $ 11,083.33 | $ 33,250.00 |
| Developer 2 | $ - | $ - |
| | Total | $ 142,950.00 |

| Months 7 - 9 | | |
| --- | --- | --- |
| VoterLabs | $ 19,066.67 | $ 57,200.00 |
| Sr. Developer 1 | $ 17,500.00 | $ 52,500.00 |
| Sr. Developer 2 | $ 17,500.00 | $ 52,500.00 |
| Developer 1 | $ 11,083.33 | $ 33,250.00 |
| Developer 2 | $ - | $ - |
| | Total | $ 195,450.00 |

| Months 9+ | | |
| --- | --- | --- |
| VoterLabs | $ 19,066.67 | $ 57,200.00 |
| Sr. Developer 1 | $ 17,500.00 | $ 52,500.00 |
| Sr. Developer 2 | $ 17,500.00 | $ 52,500.00 |
| Developer 1 | $ 11,083.33 | $ 33,250.00 |
| Developer 2 | $ 11,083.33 | $ 33,250.00 |
| | Total | $ 228,700.00 |

| Cost per Item - 12 Months | | |
| --- | --- | --- |
| Role | Month | Total |
| VoterLabs Team | $ 19,066.67 | $ 228,800.00 |
| Sr. Developer (incld. employment expenses) | $ 17,500.00 | $ 210,000.00 |
| Developer (incld. employment expenses) | $ 11,083.33 | $ 133,000.00 |

| Estimated Cost Months 1-12 | $676,800 |
| --- | --- |

24.     The Project Overview asserted 12 months to complete "80%" core
feature/functionality" and "18–24 months" to complete the project.

**Current Timeline Projections**

- Approximately 12 month estimated timeline to "80%" core features / functionality
- "80%" means, barring any unforeseen circumstances, functional features mature enough to begin delivering value, ahead of testing, optimization, and any new feature development.
- Total product maturation timeline currently estimated at 18-24 months

*During the period of development and deployment, VoterLabs will go into "hibernation"*

25.     At the time Kawecki sent the Project Overview, he knew the Revenue
Misrepresentations and Cost Misrepresentations were false.  While VoterLabs represented it would
execute the Ethos Software Project "at cost," it intended to generate additional revenue from the
difference between what it would actually pay a senior developer, like Rubino, and what it charged
Ethos Consulting.  Specifically, VoterLabs knew it would pay Rubino $6,000 a month or $18,000

every three months, but charged Ethos Consulting $17,500 a month, or $52,500. This created revenue for VoterLabs of $35,000 every three months.

26.     At the same time, the "VoterLabs Team" would receive $57,200 every three months.  It is unknown at this time how much of this money was ultimately used on the Ethos Software Project.

27.     However, VoterLabs has stated in interrogatory responses that the VoterLabs Members received no compensation.  While VoterLabs continues to resist full disclosure of the use of Ethos Consulting's money, upon information and belief, it was not spent solely on costs for the Ethos Software Project, as represented.

28.     Kawecki sent the Project Overview with the intent that Ethos Consulting would rely on these misrepresentations and never retracted or corrected these misrepresentations, despite knowing they were false.

29.     Kawecki intended that Ethos Consulting rely on, among other things, the Revenue Misrepresentations and Cost Misrepresentations (collectively, the "April Misrepresentations").

30.     Ethos Consulting justifiably relied on the April Misrepresentations in subsequently making payments to VoterLabs (starting on June 8, 2017) and entering the Agreements (on December 18, 2017).  Ethos Consulting had no reason to doubt, or even know that VoterLabs would not pay or employ developers as it was representing it would, at this time because the work had not even begun, and no relationship was formalized.

31.     On June 4, 2017, Kawecki sent Thomas an email with an attached  pdf titled "Custom Applications Suite Overview," which further misrepresented the Ethos Software Project's expected costs, by including the following:

    a.   "Development costs and timelines are realistic best estimates"; and

      b.  "Development Payment" table that tracks the three months costs found in the Project Overview (collectively, the "June Misrepresentations").

32.    This document also reconfirmed VoterLabs's representation that it would take 18–24 months to complete the Ethos Software Project.

33.    The June Misrepresentations were false because VoterLabs knew the development costs were not best estimates; rather, they were at least two times the actual known costs for the Senior Developer (*i.e.*, Rubino), and there was no "VoterLabs Team" to pay the $57, 200, thus making the Development Payment table a complete fabrication.

34.    A few days later, on June 6 or 7, 2017, Kawecki discussed the Ethos Software Project with representatives of Ethos Consulting, including Dave Terek ("Terek") and Thomas. The June Misrepresentations were even printed out for Terek's and Thomas's review.

35.    Kawecki and VoterLabs intended for Ethos Consulting to rely on the April and June Misrepresentations, and in justifiable reliance on those representations, on June 8, 2017, Ethos Consulting issued a check to VoterLabs in the amount of $109,700.  Again, Ethos Consulting had no reason to doubt, or even know that VoterLabs would not pay or employ developers as it was representing it would, again, because no work had begun on the project as of yet.

36.    Had Ethos Consulting been aware that VoterLabs did not intend to spend its money as represented in the April and June Misrepresentations, it would not have paid $109,700, and would not have subsequently entered into the Agreements (on December 18, 2017).

**3.    VoterLabs continues to advance its lies during contract negotiations, adding a new series of fraudulent representations to string Ethos Consulting along.**

37.    On August 2, 2017, Kawecki emailed  Thomas with two documents titled "Master Statement of Work" and "Terra Release 1 Statement of Work."   The Master Statement of Work

reaffirmed that VoterLabs used the Cost Misrepresentations, Revenue Misrepresentations, and June Misrepresentations to justify the "royalties," explaining the "cost basis" justification:

    i.  The development, testing and deployment of each Feature Group shall be billed by VoterLabs and paid by Ethos on a "cost" basis, with royalties payable as set forth below.

   ii.  In consideration of the "cost" basis of fees hereunder, the parties shall provide for royalty payments payable to VoterLabs upon the completion of Base Features for each Feature Group. The parties contemplate that such royalty payments shall be based upon a payment per vehicle sold by Ethos affiliates and customers, such that, upon the completion of the Base Features for all three Feature Groups, VoterLabs shall be entitled to a royalty of one dollar ($1.00) for each vehicle sold by Ethos affiliates and customers, and shall last for a period of ninety-nine (99) years. Based on additional features that may be desirable with respect to a Feature Group, additional royalties based on add-on products sold by Ethos affiliates and customers may be negotiated between the parties.

38.     Of note, VoterLabs proposed the condition precedent to any royalty payments, which is the "upon the completion" language. This language is included in § 4(a) of the SOW.

39.     VoterLabs also proposed a similar payment schedule as contained in the Cost Misrepresentations and the June Misrepresentations (with the difference that VoterLabs attempted to make the first Engagement Payment of $109,000 non-refundable and have seven subsequent payments starting at $142,900 and increasing thereafter).

40.     VoterLabs lied to Ethos Consulting about the truth of its "costs:" VoterLabs did not actually incur monthly costs, as represented, and never had any intention of doing so, as it had neither the staff, nor development competency for this work.

41.     Discussion surrounding the contract continued in August and September 2017.

42.      On September 11, 2017, Atherton, on behalf of VoterLabs, forwarded a  document to  Thomas titled "VoterLabs Ethos Upshot Resource Tracking," which represented that VoterLabs had spent 2,096.25 hours working on the Ethos Software Project between June 12, 2017 to September 11, 2017 (the "September Misrepresentations").

43.     Upon information and belief, the September Misrepresentations were false when made. Based on the information provided by VoterLabs in response to interrogatories served in this matter, VoterLabs spent no more than 1,651 hours on the Ethos Software Project.  *See* Exhibit A (analysis of VoterLabs's supplemental interrogatory responses).[14]   In coming up with the estimates based on VoterLabs's representations, Ethos Consulting assumed Kawecki worked an astounding twelve (12) hours a day for sixty-five (65) days and a total of seven hundred-eighty hours (780).[15]

44.     The September Misrepresentations were also false because (1) Rubino was not compensated in the amount of $52,500; and (2) the "VoterLabs Team" was not compensated in the amount of $57,200 (because there was no team, and VoterLabs alleges in interrogatory responses that no VoterLabs Member were paid).[16]

45.     On that same day, September 11, 2017, VoterLabs sent an invoice to Ethos Consulting for $142,900.

46.      VoterLabs made the September Misrepresentations (and April and June Misrepresentations) so Ethos Consulting would rely on them and pay the $142,900 invoice, which it did.  Ethos Consulting justifiably relied on the September Misrepresentations as it had no reason to believe VoterLabs was lying about the hours worked or the costs expenditures related thereto.

47.     Had Ethos Consulting known these representations were false, it would not have paid VoterLabs $142,900 or subsequently entered into the Agreements (on December 18, 2017).

---

[14] Attached hereto as Exhibit A is a chart that compiles the available hours during a given quarterly period based on substantive responses provided by VoterLabs. *See* VoterLabs's Interrogatory Responses, dated May 27, 2020, at Responses 4 and 14.  When VoterLabs provided a range of time worked (*i.e.*, 0 to 10 hours per week), Ethos Consulting calculated the maximum (*i.e.*, 10 hours per week).

[15] *See id.*

[16] Apparently, VoterLabs did "loan" some money to Kawecki and repaid a loan he made to keep VoterLabs afloat (totaling $59,000).

### 4.  VoterLabs's "Hibernation Fraud"[17]

48.    Upon information and belief, by October 2017, VoterLabs was using Ethos Consulting's money to pay Tom Lorenc, a "data scientist," to pursue other deals and develop code that had nothing to do with the Ethos Software Project.

49.    VoterLabs paid Lorenc approximately $68,000 from September 2017 to July 2018 (exact dates unknown). A review of documents produced in the case indicate that Lorenc was not solely working on Ethos Software Project related code, and further, code that Lorenc worked on and identified was never produced by VoterLabs.  Upon information and belief, this was just another lie in VoterLabs's larger fraud.

50.    Had VoterLabs disclosed it was using Ethos Consulting's money to pay Lorenc to pursue other projects and prepare code for other projects, Ethos Consulting would not have entered into the Agreements.

51.    Ethos Consulting suspects that other individuals were similarly paid with its money to work on other VoterLabs's projects.

### 5.   VoterLabs's "Base Royalty" fraud.

52.    Between October 2017 and November 21, 2017, Ethos Consulting and VoterLabs, with the assistance of their respective legal counsel, negotiated and exchanged multiple drafts of the Services Agreement and SOW.

53.    During the course of negotiations, Kawecki expressed concern that a new owner of Ethos Consulting would attempt to avoid paying the "Royalty."[18]

---

[17] Ethos Consulting did not ask VoterLabs to go into "hibernation," nor does it contend it relied upon VoterLabs's alleged hibernation as a requisite to enter in the Agreements.  As part of its efforts at fraudulently concealing the true use for Ethos Consulting's funds, VoterLabs's misrepresented its intent to go into hibernation.

[18] Given the deception deployed by Kawecki throughout the Ethos Consulting relationship, his paranoia is both ironic and understandable.

54.     At no time did Kawecki assert or imply that VoterLabs would receive a royalty payment until the Ethos Software Project (consisting of three "Feature Groups," as defined below) was completed.  Rather, Kawecki represented that to deter a new owner from trying to avoid paying VoterLabs the royalty due after completion, a termination payment would be due and run from the start of the Agreements.

55.     Kawecki reduced this understanding into comments that he sent to Ethos Consulting on November 21, 2017.  WJK 15 discusses the change in control concept and WJK 16 confirms that Ethos Consulting had no obligation to pay VoterLabs prior to completion of the Ethos Software Project.[19]

extend the term of the license granted herein with respect to the Patent Rights upon such terms as the parties may mutually agree.

4.   Pricing. All costs listed below are based on the scope and assumptions included in this SOW. Accordingly, there are four (4) methods of payments outlined below.

(a)   Royalties.  Upon the completion of all three Feature Groups, VoterLabs shall be entitled to a royalty of (a) one dollar ($1.00) per each Vehicle sold by a Customer Dealership Client or (b) two hundred fifty thousand dollars ($250,000) per year, whichever is greater.  The Base Royalty shall last for a period of ninety-nine (99) years from the SOW Effective Date (the "Base Royalty Term"); after the ninety-nine (99) years Customer shall have the right to use the Feature Group Services Rights without payment of Base Royalty.  During development and prior to completion of all three Feature Groups, the Base Royalty may, at the sole discretion of the Customer, be separated into multiple parts for each Feature Group – for example, thirty percent (30%) of the Base Royalty may be earned and payable upon the completion of Feature Group Terra

**Commented [WJK14]:** As agreed upon, $1 per all Ethos Customer Dealership cars sold car, as simple royalty calculation method for:
• software development priced with no expectation of profit;
• Software license
•Patent licenses
•Source code that can be modified, reused, made into different products, etc.
•Exclusivity in automobile industry
•No additional royalty for VSC, GAAP, etc.

**Commented [WJK15]:** This was suggested in case someone else were to control Ethos Group and try to figure out how not to pay the royalty/licensing fees – **let me know what you think**

**Commented [WJK16]:** Ethos Group *can* pay VoterLabs part of the royalty before the items in this statement of work are complete, *but that is up to Ethos Group*

---

[19] "WJK" represents comments by Kawecki.

56.    WJK 17 reflects the deterrence aspect that VoterLabs sought.  The termination payment would run from the start of the contract, functioning as a penalty to deter a future owner from terminating the SOW.

57.    But at no point was it discussed that VoterLabs could fail to complete the Feature Groups and still be entitled to royalty payments.

In-Store Employee Application Suite.  On an annual basis, the parties shall assess the extent to which Feature Group components have been completed, expressed as a percentage, and upon Customers sole discretion, such percentage of the Base Royalty may be payable to Service Provider thereafter.  Any agreed-upon portion of the Base Royalty shall be referred to herein as a "Partial Base Royalty" and, notwithstanding the first clause of this Section 4(a), shall be payable upon the completion of the Feature Group or portion thereof to which such Partial Base Royalty pertains.  Except as mutually agreed by the parties, upon termination of the Agreement or this SOW for any reason, Customer shall pay to Service Provider, during the Base Royalty Term, 1% of the Base Royalty for each full month that has elapsed between the SOW Effective Date and the date  of such termination.  Customer shall provide, upon request of Service Provider, a full, complete and certified accounting of the calculation of all royalty payments hereunder.  For the avoidance of doubt, this Section 4(a) shall survive the termination of the Agreement or this SOW.  All royalty payments set forth in this Section 4 shall be paid on a quarterly basis, not less than ten (10) days after the last day of each calendar quarter (March 31, June 30, September 30, December 31).

    (b)    Reimbursement for Out of Pocket Expenses.
Customer shall reimburse Service Provider for reasonable

**Commented [WJK17]:** As agreed to, termination payment = 1% of royalty for each month before license/royalty payments start.

•This protects VoterLabs in case whoever controls Ethos Group exercise their right to *terminate for any reason* with only 60 days notice.

•The "Except as mutually agreed "to part means we have the flexibility to figure this out around a table in the unlikley event it were to ever be an issue.

•Note: 1% starts last month (Oct 1), instead of when the first payment was received a few months back.

58.    In reliance upon Kawecki's explanation (to protect VoterLabs in case of a change in control), Ethos Consulting agreed to the termination payment concept, dependent upon actual completion of the Feature Groups.   Ethos Consulting was justified in relying upon these misrepresentations based on how they were layered after WJK 15 and WJK 16.

59.    Upon information and belief, and consistent with Kawecki's duplicitousness (only later uncovered), Kawecki intended to create a mechanism wherein he could make an unfounded

claim against Ethos Consulting when the Ethos Software Project failed.  And by December 2017, with VoterLabs chasing other jobs and not spending Ethos Consulting's money as represented, failure was inevitable.

60.    Had Ethos Consulting known about the April, June, or September Misrepresentations, or Kawecki's intent to create a royalty trap in the Agreements, it would not have subsequently entered into the Agreements (on December 18, 2017).

### 6.    VoterLabs's December invoice fraud.

61.    On December 11, 2017, VoterLabs sent an invoice to Ethos Consulting requesting $195,450.

62.    On December 18, 2017, Andy Atherton emailed another time tracking document to Ethos Consulting (covering September 12, 2017 to December 11, 2017) asserted VoterLabs spent 2,468 hours on the Ethos Software Project during that period of time (the "December Misrepresentations").

63.    Like the September Misrepresentations, the numbers from the December Misrepresentations are fraudulent, but for a different reason.  496 of those hours are calculated as spent by Lorenc, which, upon information and belief, was not for the benefit of Ethos Consulting or in furtherance of the Ethos Software Project.  Code prepared by Lorenc during this period was not provided to Ethos Consulting clearly indicating the work he performed was not done for Ethos Consulting.

64.    VoterLabs made the December Misrepresentations with the intent that Ethos Consulting rely on it and pay VoterLabs $195,450.  Ethos Consulting had no reason to believe VoterLabs was lying about the hours worked or progress made on the Ethos Software Project. Ethos justifiably relied upon the December Misrepresentations, along with the May, June, and September Misrepresentations, and paid VoterLabs $195,450.

**7.     VoterLabs's extra-contractual fraud is baked into the Agreements.**

65.     On or about December 18, 2017, the parties fully executed the Agreements (with effective dates of October 23, 2017).[20]

66.     The Agreements require VoterLabs to, among other things, (1) utilize skilled and qualified personnel to timely develop certain software; (2) provide a sufficient number of employees to perform the work; (3) utilize subcontractors, provided consent is obtained; and (4) provide deliverables for the approval of Ethos Consulting. *See* Services Agreement, §§ 1, 2.1, 2.3, 18; SOW, §§ 1(a–c), 6.

67.     The Ethos Software Project included three (3) Feature Groups, identified as (i) Terra In-Store Employee Application Suite, (ii) In-Market Intelligence Platform, and (iii) Exo Integrated Web Content Properties Brands Content Management System. *See* Services Agreement, § 1; SOW, § 1.

68.     For its part, Ethos Consulting agreed to pay fees in accordance with the terms of the SOW (identified as "Engagement Payments"), reimburse pre-approved expenses, pay "Usage Fees," if necessary, and make certain royalty payments upon completion of the Feature Groups. *See* Services Agreement, §§ 5.1–5.2; SOW, §§ 4(a–d).

69.     "Engagement Payments" are defined as the "consideration [paid to VoterLabs] of development of the Feature Groups." SOW § 4(d). The payments were made as three (3) month advances. *Id.* Therefore, the Engagement Payments accrued every ninety (90) days during the operative period. *Id.*

---

[20] While the Services Agreement contains an integration clause, it is not a silver bullet anti-reliance clause that VoterLabs can use for absolution.  *See Lieberman v. BeyondTrust Corp.*, 1:19-CV-01730-RGA, 2020 WL 1815547, at *2–3 (D. Del. Apr. 9, 2020).

70.     Provided VoterLabs *completed* the Feature Groups, it obtained a royalty right (defined as a "Base Royalty"). *See* SOW, § 4(a). "Base Royalty" is defined in the SOW and has a calculation mechanism, which only comes into play upon "completion of all three Feature Groups." SOW, § 4(a).

71.     As discussed above regarding the Revenue and Cost Misrepresentations, and as included in the June Misrepresentations, VoterLabs represented its quarterly costs and specified it would ramp up the number of developers every three months. The following table correlates the Cost Misrepresentations, the Engagement Payments in §4(d) of the SOW, and the representations of hours spent by VoterLabs.

| Period | Time Covered | Payment Amount | Hours Allegedly Spent | Worker assumptions |
|---|---|---|---|---|
| Engagement Period No. 1 | 6/12/17 – 9/11/17 | $109,700 | 2,096.25 | VL Team + 1 Sr Dev |
| Engagement Period No. 2 | 9/12/17 – 12/11/17[21] | $142,900 | 2,468 | VL Team + 1 Sr Dev + 1 Dev) |
| Engagement Period No. 3 | 12/11/17 – 3/16/18[22] | $194,450 | 2,988 | VL Team + 2 Sr Dev +1 Dev) |
| Engagement Period No. 4 | 3/13/2018 – 6/11/18 | $228,700 | Unknown | VL Team + 2 Sr Dev + 2 Dev) |
| Engagement Period No. 5 | 6/12/2018 – 9/10/18 | Unpaid | Unknown | VL Team + 2 Sr Dev + 2 Dev) |

72.     Neither of the Agreements allows VoterLabs to utilize Ethos Consulting's money for other projects, and §4 and 4(d) of the SOW identify the Engagement Payments as "costs" for "consideration of the development of the Feature Groups."

---

[21] Because of the representation made in VoterLabs's response to Supplemental Interrogatory No. 14, 12-11-17 is not included in this calculation.

[22] *See* VoterLabs's response to Supplemental Interrogatory No. 14, although the "Project Resources Tracking" states it covers 12-12-17-to 3-12-18, this period allegedly includes 12-11-17 to 3-16-18. Like the two Project Resources Tracking sent in June and December 2017, VoterLabs's numbers are neither believable nor accurate.

73.     As discussed above, by the time the Agreements were executed, VoterLabs was not spending Ethos Consulting's money as represented, did not have a VoterLabs Team working on this project, was already siphoning money away from the Ethos Software Project, and had no intent to use the Engagement Payments solely for the Feature Groups.

74.     But Ethos Consulting justifiably relied upon both the extra contractual and intra contractual misrepresentations in entering into the Agreements.   VoterLabs was sending Ethos Consulting regular updates as to the work performed (as evidenced by the September and December Misrepresentations), communicating regularly with Ethos Consulting employees, and without access to VoterLabs's banking records or time records evidencing the work VoterLabs allegedly performed, Ethos Consulting could not know that its money was funding other VoterLabs' projects.

**8.     VoterLabs fails to meet its development obligations.**

75.     Between June 8, 2017, and April 26, 2018, Ethos Consulting paid $676,750 which represented payments for Engagement Payments Nos. 1–4, for the development of the Feature Groups, as specified in § 4(d) of the SOW.

76.     In fact, after approximately one (1) year of development, and despite receiving and accepting these payments, VoterLabs did not complete any of the three Feature Groups or, for that matter, provide Ethos Consulting with anything of value.

77.     Upon information and belief, VoterLabs developed approximately 8,600 total lines of production code, rather than the expected 50,000 to 70,000 lines of code.[23]

---

[23] These numbers are subject to change depending on Ethos Consulting's experts review of the actual code developed. That code, as described herein, has not been turned over.

78.    Upon information and belief, the quality and amount of production code—and overall engineering effort—produced or expended by VoterLabs falls drastically short of the standard VoterLabs agreed to provide under the Agreements and does not align with the funds received and accepted by VoterLabs.

79.    In effect, the code VoterLabs developed prior to termination and provided to Ethos Consulting in November 2018, after termination, was not viable, effectively useless, did not have any appearance that it was developed by competent software professionals during the yearlong period (from June 2017 to June 2018), and was the amateurish type of code that junior level software developers would rush to create in less than a month.

80.    What VoterLabs did with most of the money it received from June 2017 to June 2018 is unknown to Ethos Consulting. But it was not spent on competent developers tasked with completing the three Feature Groups.

**9.    Ethos Consulting terminates the Agreements.**

81.    Ethos Consulting had the right to terminate the Agreements at any time and for no reason (with an effective termination date of sixty (60) days after notice). *See* Services Agreement, § 8.2. Upon termination, VoterLabs was required to return any unused Engagement Payments to Ethos Consulting and is limited to payment only for its earned fees for working to develop the Feature Groups. *See* Services Agreement, §§ 5.1, 8.2, 11.3, SOW, §§ 4(d), 6(b)(viii).

82.    Had Ethos Consulting known VoterLabs did not intend to use its money to develop the Ethos Software Project, Ethos Consulting would have not have made any payments, would not have entered the Agreements, and/or would have rescinded the Agreements, had VoterLabs disclosed the extent of its deception.

83.    On April 24, 2018, during a VoterLabs demonstration in Connecticut for Don Judice and Scarlett Shipp (of Ethos Consulting), it was obvious that the software was not viable in

41

its current form.  Ms. Shipp and Kawecki had a discussion wherein VoterLabs agreed to suspend the Engagement Payments until the first Feature Group was complete.

84.   On May 2, 2018, Ms. Shipp sent an amendment to Kawecki for his signature, and requested that VoterLabs stop all development until the parties understood how the software would perform and what modifications needed to be made.[24]

85.   Unsurprisingly, Kawecki promptly backtracked and tried to convince Terek not to terminate the project.  Upon information and belief, the reason for Kawecki's efforts had nothing to do with completing the Ethos Software Project; rather, VoterLabs needed additional payments to continue the funding and completion of some other project, presumably Axilient.

86.   On May 21, 2018, Ethos Consulting notified VoterLabs it was terminating the Agreements. The termination notice was clear, unequivocal, and ordered VoterLabs to "immediately cease all services," except for gathering and returning certain equipment, information, and property.

87.   On May 30, 2018, Kawecki traveled to Texas to meet with Ethos Consulting. During that meeting, Kawecki cried and falsely claimed Ethos Consulting's termination of the Agreements would destroy his business and put multiple employees out of work.  In hindsight, and after discovering the fraud during this litigation, Ethos Consulting now knows these were nothing more than crocodile tears and a last-ditch effort to save his fraudulent scheme.

88.   In response to a direct question, Kawecki told Terek that VoterLabs still have $130,000 of unspent funds from Ethos Consulting.    Terek offered to let VoterLabs keep the unspent $130,000 and receive an additional $200,000 in exchange for, among other things, certain

---

[24] Upon information and belief, Kawecki has significant animus towards Ms. Shipp for her efforts to terminate the Agreements (notwithstanding the fraud he perpetrated that led to the termination).

licensing rights to VoterLabs' patents.   Terek left the negotiations to Ms. Shipp and Ethos Consulting's Co-General Counsel, William Surprise.

89.     Immediately thereafter, an agreement was reached where Ethos Consulting would allow VoterLabs to keep the $130,000 (it had not yet spent) and make a post-termination payment to VoterLabs of $200,000 in exchange for a release and a license to use VoterLabs's alleged patent rights (which Kawecki alleged were valuable and needed for the work product).  VoterLabs would also wrap up the Ethos Software Project and attempt to create a standalone version of the first Feature Group.

90.     Unsurprisingly, VoterLabs promptly tried to re-trade this deal, going so far as to imply it had created over $7,000,000 in value for Ethos Consulting and was entitled to an almost $2,000,000 termination fee.

91.     On June 22, 2018, Kawecki emailed Ms. Shipp that the stand alone feature group was close to completion.  On June 25, 2018, Ms. Shipp responded that Ethos Consulting had decided not to deploy any version of the software.

92.     On July 20, 2020, the sixty (60) day termination run off ended.

93.     VoterLabs never lived up to its promises and instead continues to demand millions of dollars for providing absolutely nothing of any value.

**10.     Months later, VoterLabs provides a hard drive that allegedly contained the VoterLabs's work product.**

94.     Almost three and a half months after the termination date, on November 1, 2018, unsolicited, VoterLabs delivered to Ethos Consulting the "work product" that it allegedly created for the cost of $676,750 (the "November Hard Drive").

Enclosed herewith please find electronic copies of all "documents, work product, and other materials, whether or not complete, prepared by or on behalf of Service Provider in the course of performing the Services for which Customer has paid."

Included with the information enclosed pursuant to Section 8.4(a) of the Services Agreement is an archive of over 1,800 emails and over 1,100 files, including planning documents, working documents, research material, product development materials, data discovery files, data analysis files, wireframes and draft wireframes, product screenshots, product documentation, and UI / UX assets created during data discovery, data analysis, and product development, and finally

executable packages, including source code, for "NeosInsight" the application developed by VL, comprising the Terra feature group features, in deployable format, which together comprises all information that VL has relating to the Services Agreement identified after a reasonable and thorough search (collectively, the "Development Work"). Excluded from the information provided herein is VL's back-end code, vendor information or intellectual property which fails within the bounds of patents or patent applications, including US Patent Applications 61/722,231, PCT/US13/68354, and 15/292,104, and US Patents numbered 9,177,067, 9,348,862, and 9,471,932 and their precursors or progeny.

As described above, what VoterLabs provided does not work, does not have any value, and has the hallmarks of being hastily created in less than a month (the "Useless Code").

95.    In conjunction with this delivery, VoterLabs demanded Engagement Payment No. 5 (for work VoterLabs never provided and notwithstanding the fact Kawecki admitted it had not even spent all of the money already paid to VoterLabs), and a Base Royalty termination payment for the Feature Groups it never completed.

96.    On November 30, 2018, Ethos Consulting demanded that VoterLabs show its work and provide proof that it hired and paid developers to create the Useless Code.

*Demand for Proof of Work*

Considering VoterLabs has now threatened litigation.[12] Ethos demands information and documents validating the work allegedly performed by VoterLabs. Ethos has paid $731,750.00, but VoterLabs has neither produced nor provided any evidence showing software developed specifically for Ethos. There were no deliverables, working prototype, or any substantive work beyond an initial proof of concept.

Ethos therefore demands detailed documentation and information from VoterLabs **within ten (10) business days** of receipt of this letter. Such "Proof of Work" shall include the following information for all work completed between June 12, 2017, and July 20, 2018:

- Detailed explanation of progress for each of the three Feature Groups;
- Internal Deliverable schedules;
- Itemized task list of remaining work to complete the Feature Groups;
- Contact information for any developers, contractors and/or employees who worked on the Ethos project;
- Timesheets for any developer, contractor and/or employee who performed any tasks related to the Agreement and SOW;
- Documents evidencing payments or reimbursements related to overhead concerning the Agreement or SOW;
- QuickBooks or other similar software the documents costs and expenses associated with or related VoterLabs performance under the Agreement and SOW; and,
- List of all development tools and expenses related to the project including but not limited to Cloud based storage, software licenses and coding programs.

97.     VoterLabs's refusal and failure to substantiate its work makes sense now— VoterLabs was not using Ethos Consulting's money solely to complete the Ethos Software Project. During the course of discovery, Ethos Consulting has learned that for months after termination, VoterLabs continued to work on the code, to what end is still unknown, but the purchase of the Axilient website (January 2019) and its subsequent launch provides a strong indicator that Ethos Consulting provided Axilient's stealth funding.[25]

98.     Moreover, rather than produce the code for the Ethos Software Project in its native format (something a credible and reputable company seeking two million dollars should eagerly do), VoterLabs attempted (on two different occasions during this litigation) to pass off different

---

[25] VoterLabs contends it was in hibernation from April 6, 2017 to November 1, 2018.  In comparison, its Press Release concerning Axilient (October 1, 2019) tells a different story: "[t]he launch marks the culmination of several years of stealth development, testing, and refinement by a cross-functional team of data scientists, software engineers, strategy consultants, and business experts."

code as if it was the same code on the November Hard Drive.  Only expert analysis has uncovered this deception.

99.     Only after months of fighting in discovery have VoterLabs and Kawecki's greed and willingness to commit fraud been exposed.[26]

## TOLLING DOCTRINES

100.     To the extent necessary, any statute of limitations defense is barred by the doctrines of discovery rule, fraudulent concealment, equitable estoppel, the relation back doctrine, and/or any other applicable tolling doctrines based on the fraudulent and inequitable acts of VoterLabs, as described herein.

## COUNT I – FRAUD/FRAUDULENT INDUCEMENT

101.     Each of the preceding factual allegations contained in Paragraphs 1–100 are incorporated herein, the same as if fully set forth.

102.     VoterLabs falsely represented facts concerning the Ethos Software Project, as identified in Paragraphs 23, 31, 33, 42, 53-57, 59,  62, 65, and 71-73.[27]

103.     VoterLabs knew or believed that the representations were false or made the representation with a reckless indifference to the truth, as explained in Paragraphs 20-22, 25-27, 34, 37, 40, 59, 63-64, and 73.

104.     VoterLabs intended to induce Ethos Consulting to act in justifiable reliance upon those misrepresentations, as explained in Paragraphs 28-29, 35, 43-46, 64, and 74.

---

[26] Had VoterLabs simply taken the $200,000, Kawecki would be free to offer VoterLabs's "services" to another company.

[27] The representations upon which Ethos Consulting brings Counts I and II were made by VoterLabs either in person, telephonically, or through e-mail.  Ethos Consulting received and relied upon these representations in the State of Texas, and Ethos Consulting's harm was felt in the State of Texas.

105.    Ethos Consulting was injured by its reliance by among other things, entering into the Agreements and making payments identified herein as Engagement Payments Nos 1-4, as explained in Paragraphs 30, 35-36, 46-47, 58, 60, 64, 74, 75, and 82.

## COUNT II – NEGLIGENT MISREPRESENTATION

106.    The preceding factual allegations contained in Paragraphs 1–100 are incorporated herein, the same as if fully set forth.

107.    Pleading in the alternative, to fraud/fraudulent inducement, VoterLabs had a pecuniary duty to provide accurate information to Ethos Consulting as alleged in Paragraphs 23, 31, 33, 42, 53-57, 59,  62, 65, and 71-73.

108.    VoterLabs supplied false information to Ethos Consulting, as alleged in Paragraphs 20-22, 25-27,  34, 37, 40, 59, 63-64, and 73.

109.    VoterLabs failed to exercise reasonable care in obtaining or communicating the information, as alleged in Paragraphs 20-22, 25-27,  34, 37, 40, 59, 63-64, and 73.

110.    Ethos Consulting suffered a pecuniary loss caused by its justifiable reliance on the supplied information, as alleged in Paragraphs 30, 35-36, 46-47, 58, 60, 64, 74, 75, and 82.

## COUNT III – BREACH OF CONTRACT

111.    Each of the preceding factual allegations contained in Paragraphs 1-100 are incorporated herein, the same as if fully set forth.

112.    Pleading in the alternative to the fraud/fraudulent inducement and negligent misrepresentation claims, in the event that the Agreements constitute valid and enforceable contracts between Ethos Consulting and VoterLabs.

113.    Ethos Consulting met its obligations under the Agreements.

114.    VoterLabs failed to meet its obligations under the Agreement, including by: failing to completely or adequately develop the Feature Groups; failing to hire competent software developers to perform the amount of work necessary to develop the software required under the Agreements; accepting the full amount of the Engagement Payments without performing the amount or quality of work corresponding to the amount of the payments; and failing to return the unused Engagement Payments to Ethos Consulting upon termination.

115.    VoterLabs's breach damaged Ethos Consulting in an amount within the jurisdictional limits of the Court.

## PRAYER FOR RELIEF

For these reasons, Ethos Consulting respectfully requests that VoterLabs receive no award in connection with this suit, that the Court enter judgment in Ethos Consulting's favor on its counterclaims, award pre- and post-judgment interest to Ethos Consulting as allowed by law, rescind the Agreements and return the monies paid by Ethos Consulting to VoterLabs, award exemplary damages, and/or its attorneys' fees, and all other relief to which it may be justly entitled.

|  |  |
|---|---|
|  | */s/ Adam K. Schulman* |
| OF COUNSEL: | A. Thompson Bayliss (#4379) |
|  | Adam K. Schulman (#5700) |
| Bryan J. Wick | ABRAMS & BAYLISS LLP |
| J. Sean Lemoine | 20 Montchanin Road, Suite 200 |
| Paul T. Elkins | Wilmington, Delaware 19807 |
| WICK PHILLIPS GOULD & MARTIN, LLP | (302) 778-1000 |
| 3131 McKinney Avenue, Suite 100 | bayliss@abramsbayliss.com |
| Dallas, Texas 75204 | schulman@abramsbayliss.com |
| (214) 692-6200 |  |
| bryan.wick@wickphillips.com | *Attorneys for Defendant Ethos Group* |
| sean.lemoine@wickphillips.com | *Consulting Services, LLC* |
| paul.elkins@wickphillips.com |  |

Dated: December 4, 2020