**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **VOTERLABS, INC.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 19-524-MAK** |
| | : | **(Consolidated)** |
| **ETHOS GROUP CONSULTING** | : | |
| **SERVICES, LLC,** *et al.* | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                                     **August 4, 2021**

A Connecticut software developer signed a service agreement to develop software for several related companies formed in Texas and Delaware. A Delaware entity with a principal place of business in Texas and the Connecticut software developer entered into a service agreement choosing this Court as the selected forum. The contracting parties' relationship fell apart and the software developer sued in this Court. After this Court twice narrowed the issues, the software developer added four Texas citizens, another Delaware entity, and added new claims. The Texas and Delaware citizens now move to dismiss arguing we may not exercise personal jurisdiction over the Texas citizens and the software developer otherwise failed to plead malicious breach of contract, civil conspiracy, and tortious interference claims. After careful review of the Plaintiff's plead theories of personal jurisdiction, we grant the Texas citizens' Motion to dismiss for lack of personal jurisdiction without prejudice to the software developer possibly addressing potential deficiencies in one last amendment. We also dismiss the software developer's claims for tortious interference and civil conspiracy for failure to state a claim.

## I.     Facts.[1]

Texan David Terek owns several private companies providing products and services to car dealerships.  All of Mr. Terek's companies operate out of the same principal place of

business in Texas.[2] Two of these entities are organized under the laws of Delaware:  Ethos Group Consulting Services, LLC, a Delaware limited liability company formed in 2008 and Ethos Group Holdings, Inc., a Delaware corporation.  The rest of Mr. Terek's companies  before us (Ethos Group Services, Inc., Ethos Group Resources, Inc., Ethos Group, Inc.) are incorporated in Texas. Ethos Group Services, Inc. is the sole member of Ethos Consulting.  Ethos Group Resources, Inc. provides internal management services to the other Ethos entities.[3]

### *VoterLabs and Ethos Consulting form a business relationship.*

Connecticut software developer VoterLabs and Ethos Consulting began exploring a potential business relationship in May 2016.[4]   Ethos Consulting as well as its "affiliates [allegedly] under common control" and VoterLabs entered a Non-Disclosure Agreement governing the exchange of confidential information while working towards defining the scope of their future business relationship.[5]  Six months later, Ethos Consulting officially hired VoterLabs to enrich and analyze its data, generate customer profiles, and analyze product opportunities.[6] Ethos Consulting agreed to pay VoterLabs $55,000.[7]   VoterLabs created a document summarizing its analysis of product opportunities and submitted it to Ethos Consulting on March 28, 2017.[8]

Ethos Inc. paid VoterLabs the $55,000 Ethos Consulting contracted to pay.[9] Mr. Terek invited VoterLabs' owner Walter Kawecki to Texas to discuss the future of Ethos Consulting's and VoterLabs' relationship.[10]  The two met in Texas on April 5, 2017 where Mr. Terek said he wanted to form a permanent business partnership.[11]

Ethos Consulting held a formal meeting the next day in Mr. Kawecki's presence where Mr. Terek announced his plans for an initial public offering and the partnership with VoterLabs.[12]   Mr. Terek proposed: (1) Ethos Consulting would pay VoterLabs to develop

software for Ethos Consulting at cost; (2) VoterLabs would own the underlying intellectual property; (3) Ethos Consulting would receive exclusive rights to use the software and underlying intellectual property in the automotive sector; and (4) Ethos Consulting would compensate VoterLabs in the form of a one dollar royalty per vehicle sold or leased using the software.[13]  Mr. Kawecki orally agreed to these terms on April 6, 2017.[14]

VoterLabs sent Ethos Consulting a project overview a few weeks later which (1) identified three software components VoterLabs planned to develop for Ethos Consulting; (2) provided an eighteen-to-twenty-four-month timeline for development, testing, and optimization; (3) provided VoterLabs would go into "hibernation," or cease work for other clients, while developing the software; and (4) estimated the costs over the next twelve months. VoterLabs broke its cost estimates into four chunks.[15]  For the first three months, VoterLabs estimated Ethos Consulting would owe $109,700.[16]  For months four through six, Ethos Consulting would owe $142,950.[17]  For months seven through nine, Ethos Consulting would owe $195,450.[18]  And for months nine through twelve, Ethos Consulting would owe $228,700.[19]

Ethos Inc. wired VoterLabs the first $109,700 payment on June 8, 2017 and the second $142,900 payment on September 14, 2017.[20]

### *Ethos Consulting and VoterLabs negotiate a written Service Agreement.*

The VoterLabs team visited Ethos Consulting's Texas headquarters to negotiate a written contract on October 22, 2017.[21]  The negotiations continued through December 18, 2017.[22]  Mr. Terek and William Surprise, the general counsel for all Ethos Group entities, represented Ethos Consulting in the negotiations.[23]  Attorney Benjamin Wiles represented VoterLabs in the discussions.[24]  The parties exchanged multiple drafts during the three-month negotiation period and finalized their terms in a Service Agreement and Statement of Work (the "Service

3

Agreement").[25]  The parties signed the Service Agreement on December 18, 2017.[26]  The parties formalized, among other things, the terms of payment.[27]  The parties agreed Ethos Consulting would pay VoterLabs eight "Engagement Payments."[28]  By the time the parties executed the contract, Ethos Inc. had already made the first two Engagement Payments owed by Ethos Consulting.[29] As long as VoterLabs substantially complied with the Service Agreement, Ethos Consulting agreed to make the identified payments on (or at a reasonable time after) December 9, 2017 (payment three – $195,450), March 9, 2018 (payment four – $228,700), June 7, 2018 (payment 5 – TBD, between $195,450 and $228,700), and September 5, 2018 (payment six – TBD, between $195,450 and $228,700).[30]  In addition to the Engagement Payments, VoterLabs would also be entitled to a "Base Royalty" - one dollar per vehicle sold by or through a monthly user or $250,000 per year, whichever is greater.[31]

The parties agreed Ethos Consulting could terminate the Service Agreement without cause by giving sixty day written notice.[32]  But in the event Ethos Consulting terminated the agreement, Ethos Consulting would owe VoterLabs "the Base Royalty" for the "Base Royalty Term," defined as "a period of ninety-nine (99) years from the [Service Agreement] effective date, 1% of the Base Royalty for each full month that has elapsed between the [Service Agreement] Effective Date and the date of termination."[33]

The parties agreed Delaware would be the chosen forum for litigating disputes "in any way arising from or relating to" the Service Agreement.[34] Ethos Inc. wired VoterLabs the third Engagement Payment around December 22, 2017.[35]

### *Ethos Consulting's and VoterLabs' relationship sours.*

Ethos Resources hired Scarlett Shipp as a Platform Development Engineer around December 2017. [36]  Ethos Consulting then failed to pay the fourth Engagement Payment of

$228,700 on March 9, 2017.[37] After repeated inquiries from VoterLabs' Mr. Kawecki about the delayed payment, Ms. Shipp emailed him around April 4, 2018 asking to speak about the project.[38] To VoterLabs' knowledge, Ms. Shipp had not been involved with the project up to this point.[39] On a call with Mr. Kawecki the following day, Ms. Shipp said the parties should "take a pause" on development.[40] Mr. Kawecki told her pausing development would harm VoterLabs and his concerns about project delays from Ethos moving forward.[41]

A high-level Ethos Consulting IT professional told Mr. Kawecki the next day Ms. Shipp had unclear motives regarding the Project and he did not want VoterLabs to be "ambushed" by her.[42] At a April 24, 2018 meeting in New Haven, Connecticut, Ms. Shipp stated Ethos Consulting needed to own the software and its associated intellectual property, notwithstanding the Service Agreement.[43] Mr. Kawecki expressed a willingness to discuss a possible amendment to the Service Agreement.[44] Ethos Inc. then wired the Engagement Payment four of $228,700 around April 26, 2018, over a month late.[45]

Ms. Shipp emailed VoterLabs a proposed amendment to the Service Agreement on May 2, 2018, seeking to eliminate Ethos Consulting's obligation to make Engagement Payments, without terminating the Service Agreement.[46]  Mr. Kawecki then told Mr. Terek he found Ms. Shipp's email and proposed amendment to be hostile and contrary to the Service Agreement.[47] Mr. Terek responded he would look into the issue.[48]

Mr. Terek called Mr. Kawecki on May 18, 2018, saying Ethos Consulting would probably terminate the Service Agreement.[49] Three days later, Ethos Consulting's General Counsel William Surprise delivered a notice of termination by email and overnight mail.[50]  The notice cited the clause in the Service Agreement allowing Ethos to terminate without cause by

giving sixty days' notice.[51] Ethos Consulting's notice of termination requested VoterLabs deliver the unfinished software and work product.[52]

Ethos Consulting and VoterLabs planned to meet in Texas on May 30, 2018 to discuss next steps.[53]  In advance, Ethos Consulting executive Don Judice emailed his colleague Ms. Shipp, offering to assist with the negotiations with VoterLabs, and attaching an image of a man holding a bat wrapped in barbed wire with the caption "I'll be ready."[54]

The parties met as scheduled in Texas.  Mr. Kawecki said Ethos Consulting owed VoterLabs the fifth Engagement Payment and a termination payment.[55] Mr. Terek agreed to pay the $200,000 fifth Engagement Payment but denied Ethos Consulting's obligation to make a termination payment.[56] Mr. Terek instructed Ms. Shipp to find an alternative way forward.[57]

Mr. Kawecki emailed Ms. Shipp a week later on June 6, 2018, requesting the fifth Engagement Payment and asking Ethos Consulting to propose an alternative to the termination payment, saying, "we're open to considering anything reasonable you come up with for numbers – we just want to have a shot at surviving this and preserv[ing] our relationship with you all for the future."[58]  The June 7, 2018 deadline for Ethos Consulting to make the fifth Engagement Payment passed without a response from Ethos Consulting.[59]

Ms. Shipp forwarded Mr. Kawecki's June 6, 2018 email to Mr. Terek on June 11, 2018, but still no one responded to Mr. Kawecki.[60]  Mr. Kawecki followed up on June 15, 2018, and Ms. Shipp responded, "[n]othing new to report."[61]

VoterLabs finished the software for Ethos Consulting. Mr. Kawecki emailed Ms. Schipp on June 25, 2018 telling her the software was ready, attempting to schedule a time to give a tutorial to Ethos Consulting's IT team, and inquiring about the status of Ethos Consulting's termination payment proposal.[62]  Ms. Shipp replied the following day, informing VoterLabs

Ethos Consulting did not plan to move forward with the software and telling him General Counsel Surprise was working on putting together terms of the termination proposal.[63]

Mr. Kawecki and Ms. Shipp spoke on the phone about the termination payment provision around June 26, 2018.[64] Ms. Shipp said Ethos Consulting did not owe a termination payment, and Mr. Kawecki disagreed.[65] They agreed to have a follow-up call to further discuss the termination payment provision.[66] Ms. Shipp organized a call between herself, General Counsel Surprise, and Mr. Kawecki for July 13, 2018.[67] The parties then reviewed and exchanged correspondence regarding the negotiations leading to the Service Agreement.[68]

Ms. Shipp emailed Mr. Kawecki a "Release Agreement" and "Patent License" around July 13, 2018 and copied her colleague Mr. Judice.[69] The proposed documents called for VoterLabs to release all past, present, and future claims against Ethos Consulting and grant Ethos Consulting a perpetual, irrevocable, worldwide, royalty-free license to VoterLabs' patents.[70] Ethos would pay VoterLabs $200,000 in exchange for the license.[71]

Mr. Kawecki called Ms. Shipp and Mr. Judice,[72] asking if Ethos Consulting had proposed to pay $200,000 for the release and patent license in addition to the $200,000 already owed for Engagement Payment five.[73] Ms. Shipp and Mr. Judice insisted VoterLabs would only receive one payment of $200,000 for the release and patent license.[74]

Mr. Kawecki responded by asking why Ethos Consulting thought it could withhold an amount already owed to obtain a release and a patent license.[75] General Counsel Surprise said Ethos Consulting had no obligation to make the fifth Engagement Payment because it is not payable until "90 Days After Receipt of Payment Number 4", and Ethos Inc. paid the fourth Engagement Payment No. 4 on April 26, 2018 – more than a month after it became due.[76] General Counsel Surprise argued the Service Agreement does not require Engagement Payment

five to be made until July 25, 2018, ninety days after April 26, 2018.[77] As July 25, 2018 fell after the termination date of July 20, 2018, he reasoned Ethos Consulting did not need to pay the fifth Engagement Payment.[78]  The parties ended the call without resolution, but agreed to touch base again on August 22, 2018.[79]

Ms. Shipp and General Counsel Surprise again disputed the obligation to make the fifth Engagement Payment on the August 22, 2018 call, for the same reason previously given.[80] The parties ended the call without resolution.[81]  The parties still have not resolved their dispute and Ethos Consulting has not paid the fifth Engagement Payment or the termination payment.[82]

### *VoterLabs sues Ethos Consulting in Delaware.*

Connecticut-based VoterLabs sued Ethos Consulting in this District in March 2019, asserting two claims for breach of contract and an intentional tort claim captioned "malicious conduct in aid of an oppressive scheme."[83]  Ethos Consulting moved to dismiss the breach of contract and malicious conduct claim.  Judge Fallon recommended we deny Ethos Consulting's motion to dismiss the breach of contract claims, but grant the motion to dismiss the malicious conduct claim.[84]  Judge Fallon explained while Delaware law allows a plaintiff to recover punitive damages for willful and malicious breaches of contract, Delaware law does not recognize an intentional tort claim for malicious conduct.[85]  Judge Andrews adopted Judge Fallon's report and recommendation.[86]

VoterLabs amended its Complaint in April 2020 to replace its dismissed malicious conduct claim with a malicious breach claim.[87]  Ethos Consulting sought dismissal of the malicious breach claim. Judge Fallon recommended denying the motion, finding the pleadings "sufficient to allege a malicious breach of contract."[88]  Judge Andrews adopted the Report and Recommendation.[89]

VoterLabs amended its Complaint a second time in May 2021, adding Ethos Inc., Ethos Resources, Ethos Holdings, and Mr. Terek as defendants.[90]  VoterLabs asserted two breach of contract claims and an unjust enrichment claim against Ethos, Inc.[91]  It asserted a civil conspiracy claim against all Ethos Group entities and Mr. Terek, and it asserted a tortious interference claim against Ethos Inc., Ethos Resources, and Ethos Holdings.[92]

## II.    Analysis

Ethos Group and Mr. Terek now move to dismiss VoterLabs' second amended Complaint in part, arguing:  (1) we lack personal jurisdiction over the Texas Entities[93] and Mr. Terek; (2) the gist of the action doctrine bars VoterLabs' malicious breach claim against Ethos Consulting; (3) the gist of the action doctrine, economic loss doctrine, and intercompany conspiracy doctrine bar the civil conspiracy claims against Ethos Consulting, the Texas Entities, and Mr. Terek; (3) the bootstrapping doctrine bars the tortious interference claims against the Texas Entities and Ethos Holdings; (4) VoterLabs cannot state a claim for breach of contract claim against Ethos Inc. because it is not a party to any contract with VoterLabs; and (5) VoterLabs does not state a claim for unjust enrichment against Ethos, Inc.

We must first assess whether we have personal jurisdiction over the Texas Entities and Mr. Terek.  Finding we lack personal jurisdiction over Mr. Terek and the Texas Entities, we dismiss the breach of contract claims against Ethos Inc., the unjust enrichment claims against Ethos Inc., the civil conspiracy claims against the Texas Entities and Mr. Terek, and the tortious interference claims against the Texas Entities.  We next assess the merits of the malicious breach claim against Ethos Consulting, the tortious interference claim against Ethos Holdings, and the civil conspiracy claim against Ethos Consulting and Ethos Holdings. We find VoterLabs states a claim for malicious breach but fails to state a claim for tortious interference and civil conspiracy.

**A.      We grant the Texas Entities' and Mr. Terek's motion to dismiss for lack of personal jurisdiction. [94]**

The Texas Entities and Mr. Terek move to dismiss all claims against them, arguing we have no statutory or constitutional basis to exercise personal jurisdiction over them as they lack ties to Delaware, did not engage in conduct in Delaware, and did not create harm in Delaware. VoterLabs argues we may exercise personal jurisdiction over Mr. Terek under Section 18-109 of the Delaware Limited Liability Act because he formed a limited liability company in Delaware. VoterLabs further argues we may exercise personal jurisdiction over Mr. Terek and the Texas Entities based on: (1) the forum selection clause in the Service Agreement; (2) the Delaware Supreme Court's *Papendick* decision; (3) the alleged conspiracy theory of personal jurisdiction; and (4) the "litigation itself" theory.

Federal Rule of Civil Procedure 4(k) allows a federal court to exercise personal jurisdiction over a non-resident defendant to the extent provided by the law of the state in which the federal court sits.[95]  Our exercise of personal jurisdiction must comport with both a Delaware statute and with the Due Process clause.[96]  We find we lack both a statutory and a constitutional basis to exercise jurisdiction over Mr. Terek and the Texas Entities.  We dismiss all claims against them on the plead theories of personal jurisdiction subject to amendment.  We address each of VoterLabs' arguments regarding particular theories of jurisdiction as they relate to the constitutional and statutory analyses.

**1.      We lack a statutory basis for personal jurisdiction over the Texas Entities and Mr. Terek.**

We must analyze two statutes to determine whether we may exercise personal jurisdiction over the Texas Entities and Mr. Terek: (1) the Delaware long arm statute and (2) the Delaware Limited Liability Act.  We first assess whether the Delaware long arm statute confers personal

jurisdiction over the Texas Entities and Mr. Terek.  We then assess whether the Limited Liability Act confers jurisdiction over Mr. Terek.

> ### a.    The Delaware Long Arm statute does not confer personal jurisdiction over the Texas Entities or Mr. Terek.

We first assess whether we have jurisdiction over the Texas Entities and Mr. Terek under the plain language of the Delaware long arm statute.  We then assess whether the conspiracy theory or "litigation itself" theory allows personal jurisdiction under the long arm statute.  We do not find jurisdiction under the plain language of the statute, the conspiracy theory, or the litigation itself theory.

> ### The plain language of the Delaware Long Arm statute does not confer personal jurisdiction.

The Delaware Long Arm statute allows us to "exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent: (1) Transacts any business or performance any character of work or service in [Delaware]; (2) Contracts to supply services or things in [Delaware]; (3) Causes tortious injury in [Delaware] by an act or omission in this state; (4) Has an interest in, uses or possesses real property in [Delaware]; or (5) Contracts to act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or performed within the State at the time the contract is made, unless the parties otherwise provide in writing."[97]  Delaware courts interpret subsections the first two provisions as "provid[ing] for specific jurisdiction where the cause of action arises from the defendant's contacts with the forum" and interpret the third provision as "provid[ing] for general jurisdiction, which requires a greater extent of contacts, but which provides jurisdiction even when the claim is unrelated to the forum contacts."[98]

We address each provision in reverse order of potential applicability. There is no evidence the Texas Entities or Mr. Terek contracted to "act as a surety for" an obligation or agreement in Delaware or have an interest in real property in Delaware. We do not have jurisdiction under the fourth or fifth provision of the long arm statute.

We also do not find "tortious injury" in Delaware by an act or omission occurring in Delaware. VoterLabs is based in Connecticut. The Texas Entities and Mr. Terek are based in Texas. All the conduct giving rise to the claims occurred in either Texas or Connecticut, and not a single act or omission related to the claims occurred in Delaware. VoterLabs suffered its injury in Connecticut.

We also do not see evidence or allegation of the Texas Entities or Mr. Terek contracting to "provide services" in Delaware. Ethos Resources contracted to provide the other Ethos Group entities with personnel and facility related services, but it provided these services in Texas, not Delaware. And even if it did provide these services in Delaware, VoterLabs' claims do not arise out of this contract. While VoterLabs alleges Ethos Inc. contracted to make payments on behalf of Ethos Consulting, jurisdictional discovery did not yield evidence of such a contract aside from the payments themselves, which Ethos Inc. sent from Texas to VoterLabs in Connecticut.

We also do not find jurisdiction under the "transact[ing] business" provision. Mr. Terek and Ethos Inc. formed Ethos Consulting in Delaware, and thus arguably "transact[ed] business" in Delaware. But we may only exercise jurisdiction under this provision if the claims arise out of Mr. Terek's and Ethos Inc.'s "transact[ions]" in Delaware.[99] As we discuss in more detail below in our analysis of the Delaware Limited Liability Act and *Papendick*, VoterLabs' claims do not arise out of forming Ethos Consulting in Delaware in 2008.

12

As neither the alleged conduct nor the alleged injury occurred in Delaware, we find no basis for our exercise of personal jurisdiction under the plain language of the Delaware Long Arm statute.

### *The conspiracy theory does not confer personal jurisdiction.*

Because the Delaware Long Arm Statute allows acts committed "through an agent" to trigger personal jurisdiction, the Delaware Supreme Court recognizes a "conspiracy theory" of long-arm jurisdiction, "whereby all of the members of a conspiracy may be subjected to personal jurisdiction under [the long-arm statute] if one of the co-conspirators, acting in furtherance of the conspiracy, committed an act sufficient to invoke long-arm jurisdiction."[100]   To invoke conspiracy jurisdiction, the plaintiff must establish: "(1) a conspiracy . . . existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy."[101]

VoterLabs does not establish conspiracy jurisdiction.  As discussed in more detail in our Rule 12(b)(6) analysis below, VoterLabs does not state a claim for conspiracy because Delaware law does not recognize a claim for conspiracy to breach a contract.  VoterLabs fails to satisfy the first and second elements of conspiracy jurisdiction.  But even if VoterLabs did plead conspiracy, VoterLabs still could not establish the remaining elements.  VoterLabs is a Connecticut corporation headquartered in Connecticut.  All Ethos Group entities are headquartered in Texas, and Mr. Terek resides in Texas.  There is no evidence or allegation of a single act related to VoterLabs' claims occurring in, aimed toward, or having an effect in

Delaware. The parties negotiated, executed, performed under, and terminated performance under the contracts from their respective offices in Connecticut and Texas. There is no evidence or allegation of foreseeable effects in Delaware.

### The "litigation itself" theory does not confer personal jurisdiction.

VoterLabs argues Mr. Terek and the Texas entities are directing litigation in Delaware to harm VoterLabs, which allows us to exercise jurisdiction over them. Mr. Terek and the Texas Entities argue this theory is inapplicable. We agree with Mr. Terek and the Texas Entities.

VoterLabs' "litigation itself" theory derives from Chief Judge Farnan's 1993 decision in *Mobile Oil Corp. v. Advanced Environmental Recycling Technology Inc.*[102] In *Mobile Oil*, a company sued a defendant in Delaware, seeking to invalidate the defendant's patents.[103] The defendant joined the plaintiff-company's general counsel as a party and asserted an antitrust counterclaim against the general counsel.[104] The defendant argued the general counsel "violated federal anti-trust laws by filing declaratory judgment as part of its attempt to monopolize the composite products market."[105] The general counsel moved to dismiss for lack of personal jurisdiction, and Chief Judge Farnan denied the motion.[106] Interpreting subsection (3) of the Delaware Long Arm statute, which permits jurisdiction over a defendant who causes tortious injury in Delaware, Chief Judge Farnan held the general counsel "caused tortious injury in Delaware by authorizing [plaintiff-company's] against [the defendant]."[107]

*Mobile Oil* is inapposite. In *MobileOil*, the act of filing a declaratory judgment action in Delaware constituted the alleged anticompetitive tort. We have no similar claim. Chief Judge Farnan's analysis in *MobileOil* does not affect our analysis.

14

### b.    The Limited Liability Act does not confer personal jurisdiction over Mr. Terek.

VoterLabs argues we may exercise jurisdiction over Mr. Terek under Section 18-109 of the Limited Liability Act.  Mr. Terek argues Section 18-109 does not apply because the claims asserted do not relate to the internal affairs or corporate governance of the Delaware entities.  We agree with Mr. Terek.

Under Section 18-109, Delaware courts may exercise personal jurisdiction over the manager of a limited liability company "in all . . .  proceedings brought in the State of Delaware involving or relating to the business of the limited liability company."[108]  "An action 'involves or relates' to the business of [a limited liability company] if:  '(1) the allegations against [the manager] focus centrally on his rights, duties and obligations as a manager of a Delaware [limited liability company]; (2) the resolution of this matter is inextricably bound up in Delaware law; and (3) Delaware has a strong interest in providing a forum for disputes relating to the ability of managers of [a limited liability company] formed under its law to properly discharge their respective managerial functions.'"[109]  Delaware courts interpret this provision to "narrowly refer to corporate governance and the internal affairs of an LLC" and to not extend to ordinary "tort or contract claims."[110]

In *SC Botanicals, LLC v. Intragenix Holdings, LLC*, a licensor sued its licensee, a Delaware limited liability company, and its non-resident managers for breach of contract, tortious interference, misappropriation of trade secrets, and fraud.[111]  The non-resident managers moved to dismiss for lack of personal jurisdiction, and the licensor argued a Delaware court could properly exercise jurisdiction over the non-resident managers under section 18-109.[112]  Judge Hall disagreed and dismissed the claims against the managers, holding "[t]he claims alleged by Plaintiff against [the managers] do not arise in relation to the corporate governance or

15

internal affairs of a limited liability company" and section 18-109 "does not provide a basis for jurisdiction."[113]

Like in *SC Botanicals*, where the plaintiff alleged contract and tort claims unrelated to corporate governance or the defendants' internal affairs, VoterLabs alleges breach of contract and various tort claims against Mr. Terek, none of which relate to the corporate governance or internal affairs of the Delaware entities.[114]   The consent statute does not provide a basis for exercising jurisdiction over Mr. Terek.[115]

### 2.    We lack a constitutional basis to exercise personal jurisdiction.

Assuming *arguendo* we had a statutory basis to exercise personal jurisdiction over the Texas Entities and Mr. Terek, we would nevertheless dismiss the claims against them because we cannot exercise personal jurisdiction under the Due Process clause.

We may exercise personal jurisdiction only over those who have "minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"[116]   There are two types of personal jurisdiction:  general and specific.  We analyze each in turn.

### a.    We lack general personal jurisdiction over Mr. Terek or the Texas Entities.

We may exercise general jurisdiction over a defendant who is "essentially at home" in Delaware.  For individuals, "the paradigm forum for the exercise of general jurisdiction is the individual's domicile."[117]   For corporations, the Supreme Court instructs us to ask whether the continuous or systematic contacts "render [the corporation] essentially at home in the foreign [s]tate."[118]   Our Court of Appeals refers to a corporation's "place of incorporation and principal place of business" as where it is "at home."[119]   "[E]xceptional case[s]" may exist, where "a corporation's operations in a forum other than its formal place of incorporation or principal place

16

of business may be so substantial and of such a nature as to render the corporation at home in that [s]tate."[120]  But it is difficult to "establish general jurisdiction in a forum other than the place of incorporation or principal place of business."[121]  When these rules for general jurisdiction do not apply, general jurisdiction may exist if a defendant consents to it.[122]

Mr. Terek and the Texas Entities are "at home" in Texas – the state where Mr. Terek is domiciled and in which the Texas Entities are incorporated and maintain their principal place of business.  We lack general personal jurisdiction absent consent.  VoterLabs argues Mr. Terek and the Texas Entities consented to personal jurisdiction because they are "closely related" to Ethos Consulting, and the Service Contract signed by Ethos Consulting and VoterLabs contains a forum selection clause designating Delaware as the forum for litigating disputes.  We disagree.

In *TruInject*, Judge Hall raised "serious questions about the constitutionality of using the 'closely related' test to exercise personal jurisdiction over a non-signatory to a contract with a forum selection clause," reasoning, "the exercise of jurisdiction over a party bound by a forum selection clause is based on consent."[123]  She continued, "[i]f a party has consented to a particular forum in a 'freely negotiated' agreement, the party is deemed to have waived their right to challenge personal jurisdiction and no further due process 'minimum contacts' analysis is required."[124]  "But the rationale underlying that rule is absent in cases in which the defendant is not even a party to the agreement."[125]  "Under those circumstances," she concluded, "a court should not exercise jurisdiction unless the record otherwise demonstrates 'minimum contacts.'"[126]

We agree with Judge Hall's sound reasoning. Neither the Texas Entities nor Mr. Terek, in his individual capacity, signed the Service Agreement.[127]  None took actions in Delaware or aimed conduct toward Delaware. As discussed in more detail below, we do not find "minimum

17

contacts" with Delaware.  Absent these minimum contacts based on the presently plead theories of personal jurisdiction, we will not find Mr. Terek or the Texas Entities consented to personal jurisdiction when Ethos Consulting negotiated a forum selection clause.

### b.    We lack specific personal jurisdiction over Mr. Terek or the Texas Entities.

We may exercise specific personal jurisdiction when: (1) "a non-resident defendant has 'purposefully directed' his activities at a resident of the forum";[128] (2) "the plaintiff's claims . . . 'arise out of or relate to' the defendant's activities";[129] and (3) "exercising personal jurisdiction [does] not 'offend traditional notions of fair play and substantial justice.'"[130]

"There are different considerations in analyzing jurisdiction over contract claims and over certain tort claims."[131]  The different standards apply when determining "[w]hether a plaintiff's claims 'arise out of or relate to' the defendant's contacts with the forum state."[132]  To establish specific jurisdiction over a contract claim, the plaintiff must first "[i]dentify[] some purposeful contact with the forum."[133]  The plaintiff must next establish the claim "arise[s] out of or relate[s] to" those contacts by showing "the defendant's contacts with the forum were 'instrumental in either the formation of the contract or its breach.'"[134]  Finally, "the exercise of jurisdiction [must] otherwise comport with fair play and substantial justice."[135]

While the same three-part framework used to analyze specific jurisdiction for contract claims also applies to tort claims,[136] we ask different questions when determining whether a tort claim "arises out of or relates to" the defendant's contacts with forum.  For intentional torts, our Court of Appeals instructs us to apply the "effects test" described in *Calder v. Jones* to determine whether the claims "arise out of or relate to" the defendant's contacts.[137]  "[T]he *Calder* 'effects test' requires the plaintiff to show: (1) The defendant committed an intentional tort; (2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal

point of the harm suffered by the plaintiff as a result of that tort; and (3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity."[138]

We cannot exercise specific personal jurisdiction over the Texas Entities and Mr. Terek because they did not "purposefully direct" their conduct toward Delaware. All the conduct giving rise to this case occurred in either Texas or Connecticut, where the parties negotiated the Service Agreement, performed their obligations, and terminated their performance. The effects of the alleged conduct occurred in Connecticut, where VoterLabs is located.

### _Papendick does not confer personal jurisdiction._

VoterLabs cites the Delaware Supreme Court's analysis in _Papendick v. Bosch_, arguing we should exercise personal jurisdiction because the Texas Entities and Mr. Terek availed themselves of contact with Delaware by forming Ethos Consulting in Delaware. _Papendick_ is inapposite.

_Papendick_ involved a breach of contract in which a foreign-parent company formed a Delaware subsidiary for the purpose of executing the contract allegedly breached.[139] The foreign parent company argued the Delaware courts could not exercise personal jurisdiction over it.[140] The Delaware Supreme Court held, "We do not believe that the _International Shoe_ 'minimum contact' due process standards were intended to deprive Delaware courts of jurisdiction by permitting an alien corporation to come into this State to create a Delaware corporate subsidiary for the purpose of implementing a contract under the protection of and pursuant to powers granted by the laws of Delaware, and then be heard to say, in a suit arising from the very contract which the subsidiary was created to implement, that the only contact between it and Delaware is the 'mere' ownership of stock of the subsidiary."[141]

Unlike in *Papendick*, where a foreign corporation formed a Delaware subsidiary for the purpose of entering the contract at issue, Ethos Inc. and Mr. Terek formed Ethos Consulting eight years before VoterLabs and Ethos Consulting first formed their relationship. This evidence belies any claim Mr. Terek formed Ethos Consulting for the sole purpose of entering a contract with VoterLabs. The Delaware Supreme Court's analysis in *Papendick* does not allow us to exercise specific personal jurisdiction over Mr. Terek or the Texas Entities.

**B.    We grant in part and deny in part the motion to dismiss for failing to state a claim.**

Having dismissed Mr. Terek and the Texas Entities, we next turn to the claims against the Delaware entities: the malicious breach claim against Ethos Consulting, the tortious interference claim against Ethos Group Holdings, and the civil conspiracy claim against Ethos Holdings and Ethos Consulting. We deny Ethos Consulting's motion to dismiss the malicious breach claim, but we dismiss the tortious interference and civil conspiracy claims for failure to state a claim.

**1.    We deny Ethos Consulting's motion to dismiss the malicious breach claim.**

Ethos Consulting moves to dismiss the malicious breach claim, arguing VoterLabs is attempting to create tort liability for a contractual breach. VoterLabs argues we should refrain from dismissing the malicious breach claim because Judge Fallon and Judge Andrews held VoterLabs adequately pled malicious breach. We agree with VoterLabs.

Judge Fallon recommended Judge Andrews deny Ethos Consulting's motion to dismiss VoterLabs' malicious breach claim in a Report and Recommendation issued on October 19, 2020.[142] Judge Andrews adopted the Report and Recommendation on December 4, 2020, denying Ethos Consulting's motion to dismiss VoterLabs' malicious breach of contract claim for failure to state a claim.[143]

20

The law of the case doctrine counsels we refrain from revisiting an earlier holding unless we discover new evidence, the law changes, or we find the earlier ruling clearly erroneous.[144] Finding no new evidence related to the malicious breach allegations, change in the law, or clear error, we decline to revisit our colleagues' earlier rulings. We further note the malicious breach of contract claim is simply a breach of contract claim which could allow recovery of punitive damages if VoterLabs can prove "willful and malicious" conduct. Although "the intentional breach is similar in character to an intentional tort,"[145] it is not a tort claim.

### 2.    We dismiss VoterLabs' tortious interference claim against Ethos Holdings.

Ethos Holdings moves to dismiss VoterLabs' tortious interference, arguing the bootstrapping doctrine bars this claim. We agree with Ethos Holdings.

"To survive a motion to dismiss under Delaware law, a claim for tortious interference with business relationships must satisfactorily allege: '(1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional, wrongful interference which induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy has been disrupted.'"[146] VoterLabs must allege "wrongful conduct beyond the breach of contract itself in order to satisfy the 'intentional, wrongful interference element.'"[147] Delaware law requires a plaintiff bringing a claim based on breach of contract to "sue in contract . . . not in tort" to "prevent gratuitous 'bootstrapping' of contract claims into tort claims."[148] "To this end, while the same circumstances may give rise to a breach of contract and tortious interference claim, a plaintiff bringing the latter claim must allege breach of an 'independent duty imposed by law,' rather than a "duty which arises . . . 'by mere agreement of the parties."[149] "Even an intentional, knowing, wanton, or malicious action by the defendant will

not support a tort claim if the plaintiff cannot assert wrongful conduct beyond the breach of contract itself."[150]

VoterLabs fails to identify an "independent duty imposed by law" Ethos Holdings owed to VoterLabs beyond the contractual duty Ethos Consulting owed to VoterLabs. We dismiss the tortious interference claim against Ethos Holding under the bootstrapping doctrine.

### 3. We dismiss VoterLabs' civil conspiracy claim against Ethos Consulting.

Ethos Consulting argues we should dismiss the conspiracy claim because *inter alia* breach of contract does not constitute an underlying wrong. VoterLabs argues malicious breach of contract is an underlying wrong. We agree with Ethos Consulting.

To state a claim for civil conspiracy under Delaware law, VoterLabs must plead: "(1) a confederation or combination of two or more persons; (2) [a]n unlawful act done in furtherance of the conspiracy and (3) [a]ctual damage."[151] "Although the elements of a claim for civil conspiracy are flexible, it is essential that there be an underlying wrongful act, such as a tort or a statutory violation."[152] "A breach of contract is not an underlying wrong that can give rise to a civil conspiracy claim."[153]

We are persuaded by Chancellor Chandler's analysis in *Kudora v. SPSJ Holdings* holding a breach of contract cannot furnish the underlying wrong necessary to plead a civil conspiracy claim.[154] In *Kudora*, an investment advisor entered into several contracts with limited liability companies to give them investment advice in exchange for payment.[155] When the companies failed to pay him, he sued the entities for breach of contract, tortious interference with contract, tortious interference with prospective economic advantage, breach of the implied covenant of good faith and fair dealing, conversion, unjust enrichment, and civil conspiracy.[156] Chancellor Chandler dismissed all claims aside from the contract claims – emphasizing the investment

advisor's claims are governed by contract law.[157]    Regarding the civil conspiracy claim, Chancellor Chandler held, "a breach of contract cannot constitute an underlying wrong on which a civil conspiracy could be based" unless "the breach also constitutes an independent tort."[158] He explained, "[j]ust as a plaintiff generally cannot use a claim for tortious interference with contract to impose additional damages on contracting parties . . . , a plaintiff cannot use a claim for civil conspiracy to impose on contracting parties . . . additional damages for a breach of a contract, beyond those reasonable under contract law for the breach of contract."[159]

Like in *Kudora*, where the investment advisor asserted many theories of liability but ultimately alleged only a straightforward breach of contract, VoterLabs' civil conspiracy claim is Ethos Group Entities and Mr. Terek conspired to breach the Service Agreement.  A conspiracy to breach a contract is not cognizable under Delaware law. VoterLabs cites no cases in which a court found "malicious breach" to be an underlying wrong.  We find no basis to sustain this claim.

## III.    Conclusion

We dismiss all claims against David Terek, Ethos Group, Inc., and Ethos Group Resources, Inc., for lack of personal jurisdiction without prejudice.  We dismiss the civil conspiracy claim against Ethos Consulting and tortious interference claims against Ethos Group Holdings for failure to state a claim without prejudice   VoterLabs may proceed with the malicious breach claim and the remaining contract claims against Ethos Consulting subject to timely amendment under today's Order.

---

[1] We derive the facts from the allegations in the second amended Complaint and, to the extent relevant, the facts adduced during jurisdictional discovery.  The facts adduced in jurisdictional discovery, filed at ECF Doc. No. 191 and 192, will be referred to by the ECF Document Number and the pagination assigned by ECF.

---

[2] ECF Doc. No. 147 ¶¶ 3, 159 -63.

[3] We refer to:  Ethos Group Consulting Services, LLC as "Ethos Consulting"; Ethos Group Services, Inc. as "Ethos Services", Ethos Group, Inc. as "Ethos Inc.", Ethos Group Resources, Inc. as "Ethos Resources"; Ethos Group Holdings, Inc." as "Ethos Holdings."  We will refer to Ethos Services, Ethos Inc., and Ethos Resources collectively as the "Texas Entities".  Where it is not clear which Ethos Group entity is acting or when the Ethos Group entities collectively act we will refer to the entity or entities as "Ethos Group."

[4] ECF Doc. No. 192 at 10.

[5] ECF Doc. No. 147 ¶¶ 3, 159 -63.

[6] *Id.* ¶ 10

[7] *Id.*, ECF Doc. No. 191 and 305-06.

[8] *Id.* ¶ 13.

[9] ECF Doc. No. 191 at 43, 305.

[10] ECF Doc. No. 147 ¶ 14.

[11] *Id.* ¶¶ 15-16.

[12] *Id.* ¶ 18.

[13]  *Id.* ¶ 19.

[14] *Id.* ¶ 21.

[15] *Id.* ¶¶ 23-28.

[16] *Id.* ¶ 28.

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] ECF Doc. No. 191 at 46, 50, 308.

[21] *Id.* ¶ 32.

[22] *Id.* ¶ 34.

[23] *Id.* ¶ 35.

[24] *Id.*

[25] *Id.* ¶ 38.

[26] *Id.*

[27] *Id.* ¶ 43.

[28] *Id.*

[29] *Id.* at ¶ 45.

[30] *Id.* at ¶ 43-46.

[31] *Id.* at ¶ 50.

[32] *Id.* at ¶ 56.

[33] *Id.*

[34] ECF Doc. No. 192 at 60.

[35] ECF Doc. No. 191 at 209.

[36] ECF Doc. No. 191 at 2.

[37] ECF Doc. No. 147 at ¶ 75.

[38] *Id.* at ¶ 76-7.

[39] *Id.* at ¶ 77.

[40] *Id.* at ¶ 79.

[41] *Id.* at ¶ 80.

[42] *Id.* at ¶ 82.

[43] *Id.* at ¶ 88.

[44] *Id.*

[45] *Id.* at ¶ 89-90; ECF Doc. No. 191 at 55.

[46] *Id.* at ¶¶ 91-92.

[47] *Id.* at ¶ 94.

[48] *Id.*

[49] *Id.* at ¶ 95.

[50] *Id.* at ¶ 96.

[51] *Id.* at ¶ 97.

[52] *Id.* at ¶¶ 99-100.

[53] *Id.* ¶ 101.

[54] *Id.* ¶ 129.

[55] *Id.* at ¶ 104.

[56] *Id.* at ¶ 105.

[57] *Id.* at ¶ 106.

[58] *Id.*

[59] *Id.* ¶ 111.

[60] *Id.*

[61] *Id.* ¶ 113.

[62] *Id.* ¶ 114.

[63] *Id.* ¶ 115.

[64] *Id.* at ¶ 117.

[65] *Id.*

[66] *Id.*

[67] *Id.* at ¶ 118.

[68] *Id.* at ¶ 120.

[69] *Id.* at ¶ 125.

[70] *Id.* at ¶ 126.

[71] *Id.*

[72] *Id.* at ¶ 131.

[73] *Id.*

[74] *Id.*

[75] *Id.* at ¶ 132.

[76] *Id.* at ¶ 134.

[77] *Id.*

[78] *Id.*

[79] *Id.* ¶ 141.

[80] *Id.* at ¶ 142.

[81] *Id.* ¶ 145.

[82] *Id.* at ¶ 152-53.

[83] ECF Doc. No. 2.

[84] ECF Doc. No. 22.

[85] *Id.* at 13-14.

[86] *Id.* at 27.

[87] ECF Doc. No. 52.

[88] ECF Doc. No. 103.

[89] ECF Doc. No. 122.

[90] ECF Doc. No. 147.

[91] *Id.*

[92] *Id.*

[93] *See supra*, note 2 (defining the Texas Entities as Ethos Inc., Ethos Resources, and Ethos Services).

[94] VoterLabs did not assert an alter ego theory of jurisdiction and instead it informed us it is "studying the issue" after completing jurisdictional discovery.  ECF Doc. No. 190 at 24 (using ECF pagination).  It moved for leave to amend yesterday without the Ethos parties' consent to an amendment.  .ECF Doc. No. 199.  The motion is not ripe.  We today grant VoterLabs leave to timely amend one last time based on the knowledge to date.  We deny the pending motion to amend as moot.

[95] Fed. R. Civ. P. 4(k)(1)(A).

[96] *Intellectual Ventures I LLC v. Ricoh Co. Ltd.*, 67 F. Supp. 3d 656, 659 (D. Del. 2014) ("To establish personal jurisdiction, a plaintiff must produce facts sufficient to satisfy two requirements by a preponderance of the evidence, one statutory and one constitutional.")

[97] 10 Del. C. § 3104.

[98] *ANI Pharms., Inc. v. Method Pharms., LLC*, No. 17-1097, 2019 WL 176339 (D. Del. Jan. 11, 2019).

[99] *Shoemaker v. McConnell*, 556 F. Supp. 2d 351, 354-55 (D. Del. 2008).

[100] *Chandler v. Ciccoricco*, No. 19842-NC, 2003 WL 21040185 (Del. Ch. May 5, 2003) (citing *Instituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 225 (Del. 1982)).

[101] *Instituto Bancario Italiano Spa v. Hunter Eng'g Co.*, 449 A.2d at 225.

[102] 833 F. Supp. 433, 443-47 (D. Del. 1993).

[103] *Id.*

[104] *Id.* at 443-44.

[105] *Id.* at 439.

[106] *Id.*

[107] *Id.* at 444.

[108] 6 *Del. C.* § 18-109.

[109] *Endowment Research Grp. LLC v. Wildcat Venture Partners, LLC*, No. 2019-0627, 2021 WL 841049, at *38 (Del. Ch. Mar. 5, 2021) (quoting *Vichi v. Koninklijke Phillips Elecs. N.V.*, No. 2578-VCP, 2009 WL 4345724, at *8 (Del. Ch. Dec. 1, 2009)).

[110] *Id.*

[111] No. 20-1698, 2021 WL 2156503, at *2 (D. Del. May 27, 2021).

[112] *Id.* at *5.

[113] *Id.*

[114] *Id.*

[115] *Id.*

[116] *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

[117] *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011).

[118] *Daimler AG v. Bauman*, 571 U.S. 117, 119 (2014) (quoting *Goodyear*, 564 U.S. at 919).

[119] *Malik v. Cabot Oil & Gas Corp.*, 710 F. App'x 561, 563 (3d Cir. 2017) (quoting *Daimler AG*, 571 U.S. at 137).

[120] *Kurz v. Holiday Hospitality Franchising, LLC*, No. 19-2129, 2019 WL 5068646, at *3 (E.D. Pa. Oct. 9, 2019) (quoting *Daimler AG*, 571 U.S. at 139 n.19).

[121] *Alcatel-Lucent*, 441 F. Supp. 3d at 73 (quoting *Chavez v. Dole Food Co.*, 836 F.3d 205, 223 (3d Cir. 2016)).

[122] *Kraus v. Alcatel-Lucent*, 441 F. Supp. 3d 68, 73 (E.D. Pa. 2020).

[123] *TruInject Corp. v. Nestle Skin Health, S.A.*, No. 19-592, 2019 WL 6828984, at *11 (D. Del. Dec. 13, 2019).

[124] *Id.*

[125] *Id.*

[126] *Id.*

[127] Mr. Terek signed the agreement on behalf of Ethos Consulting.

[128] *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

[129] *Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 130 (3d Cir. 2020) (quoting *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007)).

[130] *Id.* (quoting *O'Connor*, 496 F.3d at 316).

[131] *Remick v. Manfredy*, 238 F.3d 248, 255–56 (3d Cir. 2001); *see also Miller Yacht Sales, Inc.* 384 F.3d at 99.

[132] *Danziger & De Llano, LLP*, 948 F.3d at 130.

[133] *O'Connor*, 496 F.3d at 318.

[134] *Stursberg v. Morrison Sund, Pllc*, No.20-1635, 2020 WL 7319546, at *9 (E.D. Pa. Dec. 11, 2020) (quoting *Shafik v. Curran*, No. 09-2469, 2010 WL 2510194, at *5 (M.D. Pa. June 17, 2020)).

[135] *Numeric Analytics, LLC v. McCabe*, 161 F. Supp. 3d 348, 354 (E.D. Pa. 2016) (quoting *Burger King Corp.*, 471 U.S. at 476).

[136] *See Danziger & De Llano, LLP*, 948 F.3d at 129–30.

[137] *Marten v. Godwin*, 499 F.3d 290, 297 (3d Cir. 2007) (internal citations omitted). "Courts have reached different conclusions about whether the *Calder* test modifies or simply adds to the general test for specific jurisdiction." *McCabe*, 161 F. Supp. 3d at 357 n.3. In *Danziger & De Llano, LLP v. Morgan Verkamp LLC*, our Court of Appeals recently instructed the "effects test" applies when determining "[w]hether a plaintiff's claims 'arise out of or relate to' the defendant's contacts within the forum state." *Danziger & De Llano, LLP*, 948 F.3d at 130.

[138] *IMO Industries, Inc. v. Kiekert AG*, 155 F.3d 254, 265–66 (3d Cir. 1998) (footnote omitted); *see also Danziger & De Llano, LLP*, 948 F.3d at 130.

[139] 410 A.2d 148, 149-50 (Del. 1979).

[140] *Id.* at 150.

[141] *Id.* at 152.

[142] ECF Doc. No. 103 at 12.

[143] ECF. Doc. No. 122.

[144] *Pub. Int. Research Grp. Of N.J., Inc. v. Magnesium Elektron, Inc.,* 123 F.3d 111, 116 (3d Cir. 1997).

[145] *Ripsom v. Beaver Blacktop, Inc.,* No. 83C-AU-128, 1988 WL 32071 at *16 (Del. Super. Apr. 6, 1988), *aff'd,* 567 A.2d 418 (Del. 1989) (*quoting Reiver v. Murdoch & Walsh, P.A.,* 625 F. Supp. 998, 1015 (D.Del. 1985)).

[146] *Dynamis Therapeutics, Inc. v. Alberto-Culver, Inc.*, No. 09-773, 2010 WL 3834405, at *5 (D. Del. Sept. 24, 2010) (quoting *Lucent Info. Mgmt. v. Lucent Techs.,* 5 F.Supp.2d 238, 243 (D.Del.1998)).

[147] *Id.* (quoting *Del. State Univ. Student Housing Found. v. Ambling Mgmt. Co.,* 556 F.Supp.2d 367, 377–78 (D.Del.2008)).

[148] *Id.* (citing *Del. State Univ. Student Housing Found.*, 556 F. Supp. 2d at 367).

[149] *Id.* (citing *Del. State Univ. Student Housing Found.*, 556 F. Supp. 2d at 367).

[150] *Data Mgmt. In'l., Inc. v. Saraga*, 2007 WL 2142848, at *3 (Del. Super. Ct. July 25, 2007).

[151] *Tani v. FPL/Next Era Energy*, 811 F. Supp. 2d 1004, 1025 (D. Del. 2011).

[152] *Id.*

---

[153] *Id.*

[154] 971 A.2d 872, 892 (Del. Ch. 2009).

[155] *Id.*

[156] *Id.* at 877.

[157] *See id.* at 893 ("The core of plaintiff's claim in this case is that he is owed money pursuant to a limited liability company agreement to which he is a party. Generally, when a plaintiff's claims are governed by a contract, the available remedies will be limited to those available for breach of that contract. Accordingly, it should come as no surprise that the complaint has failed to state a claim upon which relief can be granted for many of the non-contractual claims that were asserted in the complaint.")

[158] *Id.* at 892.

[159] *Id.* at 892 n.73.